*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0133P (6th Cir.)
File Name: 02a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

EMIL EWOLSKI,
 *Plaintiff-Appellant,*

 *v.*

No. 00-3066

CITY OF BRUNSWICK, et al.,
 *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 96-00647—Dan A. Polster, District Judge.

Argued: September 19, 2001

Decided and Filed: April 18, 2002

Before: GUY and MOORE, Circuit Judges; HULL,*
District Judge.

———————————

## COUNSEL

**ARGUED:** Terry H. Gilbert, FRIEDMAN & GILBERT, Cleveland, Ohio, for Appellant. Nick C. Tomino, TOMINO & LATCHNEY, Medina, Ohio, for Appellees. **ON BRIEF:**

———————————

 *The Honorable Thomas Gray Hull, United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

Terry H. Gilbert, FRIEDMAN & GILBERT, Cleveland, Ohio, Roy J. Schechter, TEAMOR & ASSOCIATES, Cleveland, Ohio, for Appellant.    Nick C. Tomino, TOMINO & LATCHNEY, Medina, Ohio, for Appellees.

MOORE, J., delivered the opinion of the court, in which GUY, J., joined.  HULL, D. J. (pp. 39-45), delivered a separate dissenting opinion.

————————

**OPINION**

————————

KAREN NELSON MOORE, Circuit Judge.  Plaintiff-Appellant Emil Ewolski, acting as Administrator for the estates of John M. Lekan, Beverly Lekan, and John T. Lekan, appeals the district court's decision granting summary judgment to all defendants in the instant § 1983 and state law tort action.  Appellant's suit alleges violations of the Lekans' federal constitutional rights as well as several state law tort claims arising from the conduct of the Brunswick Police Department leading up to and during a two-day armed standoff with Mr. Lekan, which tragically ended with Mr. Lekan's decision to kill his son and himself.  Specifically, Appellant claims:  (1) that the police violated the Fourth Amendment by making a warrantless entry into the Lekan home without sufficient evidence of exigent circumstances, (2) that the police used excessive force against Mr. Lekan and his family during the standoff in violation of the Fourth Amendment, (3) that the police's conduct during the standoff demonstrated deliberate indifference to the safety of the Lekan family in violation of the Fourteenth Amendment, (4) that the City of Brunswick was liable for the Lekans' constitutional injuries because the decisions of the Brunswick Chief of Police in supervising the standoff were those of a final policymaker and because the City failed adequately to train its officers; and (5) that the police are liable under state law for trespass, assault and battery, intentional infliction of mental distress, conspiracy, and wrongful death.  For the

reasons stated below, we **AFFIRM** the decision of the district court.

## I. BACKGROUND

On March 28, 1996, Beverly Lekan and Emil Ewolski, the administrator for the estates of John M. Lekan and John T. Lekan, filed this action alleging that the defendants violated the Lekans' Fourth and Fourteenth Amendment rights as secured by the United States Constitution. The complaint also alleged state common law claims of trespass, assault and battery, intentional infliction of mental distress, and conspiracy, as well as statutory claims for wrongful death. After the commencement of this lawsuit, Beverly Lekan died of illness unrelated to the instant action, and her claims were assumed by Emil Ewolski as administrator of her estate. On December 8, 1999, the trial court granted a motion for summary judgment filed by the defendants in regard to all of plaintiffs' federal and state claims, and dismissed the plaintiffs' complaint in its entirety.

At the time of the incident, Beverly Lekan was bedridden with multiple sclerosis and had been receiving home health services from Tri-County Home Nurses, Inc. ("Tri-County") for approximately one year without any significant problems. While Tri-County provided Mrs. Lekan with assistance with her catheter and helped her to bathe, she relied on her husband John Lekan for the care of their nine-year-old son J.T., as well as the cooking and cleaning for the household.

On March 19, 1995, while Mrs. Lekan was receiving her bi-weekly home health services, Mr. Lekan, carrying a rifle, entered the room where a Tri-County aide was caring for Mrs. Lekan. At one point, Mr. Lekan placed the weapon only a few inches from the aide's face. Mr. Lekan again displayed a rifle during the visit by the aide on March 22, 1995. Subsequently, on March 27, 1995, the Tri-County aide reported the incidents to her superior Barbara Hillegass. Because of her concern for the safety of the healthcare workers going to the Lekan home, Hillegass called Mrs. Lekan on March 30, 1995, and advised her that Tri-County

wanted her husband to sign a contract regarding his guns. Hillegass also asked Mrs. Lekan if she was comfortable discussing this contract with her husband, and she indicated that she would talk to him about it. However, in about half an hour, Mrs. Lekan called back and stated that she was not comfortable discussing the contract with her husband. In response, Hillegass stated that Tri-County would discuss the contract with Mr. Lekan.

On the morning of March 31, 1995, Mrs. Lekan called Tri-County and informed them that she did not want a home health aide that day and that she wanted to consider a nursing home placement. She also allegedly informed Tri-County that her husband was angry and he had kept their son home that day. Because of concern for Mrs. Lekan, Hillegass called Mrs. Lekan back and asked her if there was a problem. When Mrs. Lekan did not respond, Hillegass asked her again if there was a problem. At that point, Mr. Lekan spoke from an extension and spewed various profanities at Hillegass.

Later, at about 8:50 a.m. that same morning, Mrs. Lekan's mother, Helen Ewolski, advised Hillegass that Mr. Lekan suffered from post-traumatic stress syndrome, and that although he had been verbally abusive to his wife in the past, he had never been physically abusive. At 11:15 a.m., Hillegass called the Cleveland Clinic to talk to Dr. Kinkle who was Mrs. Lekan's physician. She expressed concern for Mrs. Lekan and for the safety of J.T., her son. She was told that Dr. Kinkle was not available, but that he also had a message to call Mrs. Lekan.

Hillegass also confirmed that around noon on March 31, 1995, Tri-County notified Adult Protective Services of their concerns in regard to Mrs. Lekan, and Children's Services of their concerns in regard to J.T. At around 1:30 p.m., Hillegass received information that neither Adult Protective Services nor Children's Services considered this to be an emergency situation, and that neither agency would be taking further immediate action that day in regard to the Lekan home situation. Nevertheless, Medina County Human Services

physical harm to Mrs. Lekan, however, he ignored this risk to her and was deliberately indifferent to the danger to her.

The issue of qualified immunity was also addressed in *Stemler*, 126 F.3d at 868, which held that the defendants should have known under clearly established law that they owed a duty to Black not to force her in harm's way after officers had taken affirmative action which deprived Black of her liberty. Similarly, in this case, because the Lekans had been confined in their home and deprived of their liberty by the standoff situation, the defendants should have known under clearly established law that they owed the Lekans a duty not to force them into a situation where they would suffer harm.

In this case, taking the evidence in a light most favorable to the plaintiffs, the evidence would support a finding by the jury that in conducting the standoff, Chief Beyer did not act with objective reasonableness and/or that he was deliberately indifferent to a threat of physical injury to the Lekans, and as a matter of law, he is not entitled to qualified immunity. Accordingly, I believe summary judgment should not have been granted in regard to the plaintiffs' excessive force claims.

In regard to the plaintiffs' state causes of action, the Sixth Circuit has recognized a general rule disfavoring a district court's exercise of pendent jurisdiction when federal issues are dismissed before trial. *Gaff v. FDIC*, 814 F.2d 311, 319 (6th Cir.1987). However, the district court in this case did address each of the plaintiffs' state claims after finding no merit to the plaintiffs' federal claims. I believe these state claims should have been dismissed without prejudice.

### CONCLUSION

For the reasons stated herein, based on disputed material facts in this case, I believe summary judgment for the defendants in regard to the plaintiff's federal and state claims was inappropriate, and the judgment of the trial court should have been reversed and remanded.

Taking the evidence in a light most favorable to the plaintiffs, given the advice detailed by Callis that Chief Beyer had from mental health professionals at the scene, the evidence in this case would support a finding by the jury that in conducting the standoff, Chief Beyer did not act with "objective reasonableness." Therefore, summary judgment should not have been granted in regard to the plaintiffs' Fourth Amendment claims.

In the alternative, even if there was no seizure, the defendants could have been found to have used excessive force under the analysis of a Fourteenth Amendment Claim. The district court concluded that Chief Beyer was held to a deliberate indifference standard in regard to his supervision of the standoff, and under the facts of this case, this claim could not survive summary judgment because the plaintiffs could not show that he was deliberately indifferent to an obvious risk of harm actually suffered by the plaintiffs.

Based upon the factual circumstances of this case, Chief Beyer had a reasonable opportunity to deliberate and consider various alternatives prior to electing a course of action, and his actions would be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiffs' federally protected rights. *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001). Viewing the facts as summarized by the district court in a light most favorable to the plaintiffs, I believe a rational jury could find that Chief Beyer's course of action was deliberately indifferent because a rational jury could conclude that there was an obvious threat of physical injury to the Lekans (and the potential threat of physical injury was the very premise for the officers' "welfare check," in the first place). Chief Begley also knew Mr. Lekan was paranoid and that his mental condition and unpredictable behavior were major factors to contend with in regard to the entire incident. In spite of this knowledge, he did not take advantage of the advice of mental health professionals who were present at the scene. In addition, Chief Begley was specifically told that the use of tear gas could result in

contacted the Brunswick Police Department concerning the information they had received from Hillegass.

At 1:45 p.m., Hillegass received a phone call from Sergeant Nick Solar concerning the Lekan situation. Hillegass asked Sergeant Solar what actions he anticipated the police would take. He told her that this was a potential stand-off situation, that he was going to devise a game plan, and that the police would probably make a call. He indicated that he had been made aware of the situation sometime before 1:45 p.m. by the social services agencies.

Sergeant Solar then met with Sergeant Stukbauer, Detective Schnell, Patrol Officer Marok, and Patrol Officer Sam Puzella to discuss the situation. Detective Schnell told Solar that he had learned in December of 1994 that John Lekan was a paranoid schizophrenic and if any police officers tried to commit him to a mental facility, there was a potential for violence. Schnell also had confirmed just prior to the meeting after a contact with Suzanne Lekan, who was a police dispatcher and John Lekan's sister-in-law, that John Lekan was a paranoid schizophrenic and he had not been taking his medication. Suzanne further informed Schnell that John Lekan had loaded guns, and that she believed he would shoot at police officers if they went to the home.

After a discussion, Solar decided to dispatch two officers to the Lekan residence in order to determine whether Beverly Lekan or her son was in danger. Officer Dale Schnell volunteered to go to the Lekan home with Officer Sam Puzella. Solar and other officers went to the Rolling Hills Shopping Center near the Lekan residence in case further assistance was needed. Because of the information they had received regarding John Lekan's possible violent reaction to police officers, Solar advised Puzella to wear civilian clothes rather than a police uniform. Schnell was already wearing civilian clothes.

Schnell and Puzella drove to the Lekan residence in an unmarked car, parked, and walked up to a small porch by the front door. Schnell knocked on the outer storm door which

was in front of the interior door and John Lekan opened the interior door. The officers did not identify themselves and Puzella asked to speak to Mrs. Lekan. The officers could not hear Mr. Lekan's response. Puzella asked him to open the storm door so they could hear him, but Mr. Lekan did not open the door. Instead, he went to a small nearby open window and said that the officers could hear him through the window. When Puzella again asked to speak to Mrs. Lekan, Mr. Lekan did not respond, and at one point he started to sing the *Star Spangled Banner*.

Puzella then took out his police badge and identification card and held them up to the open window. He told Mr. Lekan that he was a police officer and that he needed to speak to Mrs. Lekan. Mr. Lekan immediately moved away from the window and slammed the front door. Puzella pulled the storm door open and tried to open the front door, but it was locked. Puzella then kicked the door until it finally opened. Puzella entered the house and was shot by Mr. Lekan. Puzella and Schnell retreated from the home and called for assistance. Puzella was then removed from the scene.

The officers contacted Brunswick Police Chief Patrick Beyer and informed him of the events at the Lekan home. Beyer contacted the officer in charge of the Emergency Response Team ("ERT"), Sergeant McDermott, and the two went to the scene. Beyer established perimeters around the Lekan home, evacuated neighboring residents, and mobilized the ERT. Chief Beyer instructed Sergeant Solar, who was trained in hostage negotiation, to return to the police station and assume the role of chief negotiator.

In the meantime, Mrs. Lekan called the Brunswick Police Department to report that her door had been broken down and that someone had been shot. The police transferred the call to Sergeant Solar. Solar asked to call her back on another line. When Solar called back, Mr. Lekan answered the phone. He told Solar that "the first officer was lucky" and that he had his ".270 [rifle] loaded and ready to go." Joint Appendix ("J.A.") at 936 (Solar Dep. at 95). Solar asked Lekan if he would

13    Beyer ordered this vehicle to the scene without informing his chief negotiator, Sergeant Solar. Thus, the vehicle appeared on the scene while Solar was still attempting to negotiate a peaceful resolution of the standoff. This could only confirm Mr. Lekan's paranoid suspicion that the police were out to get him, and that he could not trust them. Although the vehicle's loudspeaker ordered Mr. Lekan to pick up the telephone or come out of the house, the phone line had been disconnected -- further reinforcing Mr. Lekan's paranoia. And while an armored vehicle circling a home, flooding it with light, and caving the walls in might cajole a sane person into submission to police authority, this strategy was riskier with an unstable person such as Mr. Lekan.

In addition, the report of William Callis, in regard to his interview with Chief Beyer, indicates that the electric power to the Lekan home was cut off "to manipulate Mr. Lekan's environment," and "the lack of power allowed the police to control the area." Mr. Lekan's access to the outside was also restricted by open telephone lines between the negotiators and the Lekan residence. According to Callis' report, it was Chief Beyer's belief that use of the armored vehicle would show Mr. Lekan "enough potential force to get him to surrender," and force was also shown by the many armed police officers who were members of the SWAT teams that surrounded the Lekan home.

Construing the facts in a light most favorable to the plaintiffs, it is obvious that all the members of the Lekan family were affected by the actions of the police in controlling communications to the home, in the control of their environment by cutting off the power to the home which left them without heat and electricity, by the introduction of tear gas into their home by officers who used ferret rounds fired from shotguns, and by the show of force as armed officers with the armored vehicle surrounded their home. Consequently, I believe the Lekans were in the custody of the defendant officers in the sense that the officers had affirmatively acted to deprive all of them of their liberty.

I also believe that the plaintiffs' excessive force claims should have gone to the jury. In this case, the district court concluded that there was no seizure because Chief Beyer did not intend to arrest Mrs. Lekan or her son, and because Mr. Lekan barricaded himself in his own home. However, in *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir.1997), cert. denied, 523 U.S. 1118, (1998), Conni Black was killed in a car accident after officers threatened to arrest her if she did not return to the vehicle of her abusive, intoxicated boyfriend. The fatal accident occurred five minutes after officers returned her to her boyfriend's vehicle, and her boyfriend left the scene. In *Stemler*, this court concluded that Black was in the custody of the defendant officers in the sense that they had affirmatively acted to deprive her of her liberty, rather than merely negligently refusing to act to protect her.

In regard to the manner in which Chief Beyer conducted the standoff, the district court summarizes in footnotes 12 and 13 of the Memorandum of Opinion and Order:

12  Armed tactical solutions are radical strategies used only as a last resort in hostage situations. Use of it here was premature. Police Chief Beyer commenced the plan only five hours after the standoff began. There was still hope for a peaceful resolution at this time. Mr. Lekan had completely retreated from confrontation. There was no evidence that he harmed his family or intended to harm them, and he was not shooting at police officers. There was insufficient manpower to carry out the plan successfully at this time, and the defendants did not yet have the equipment to determine the location of the residents. In addition, the plan had a high probability of failure. It called for officers to run through the house with loaded weapons *looking for Mr. Lekan* after creating a diversion through the use of incendiary devices. It is unclear what the police would have done had Mr. Lekan been discovered in close proximity with his family. Also, the incendiary devices set a fire in the house, which the officers then had to stop to put out.

come out of the house and assured Lekan that the police did not want anybody to get hurt. Mr. Lekan told Solar that his home was his castle and nobody was going to take him or anything else out of it. Chief Beyer later asked Solar to return to the Lekan house. After arriving at the scene, Solar continued trying to negotiate with Mr. Lekan by telephone. Mr. Lekan made no demands, and became increasingly incoherent as the standoff progressed. At one point, Mr. Lekan asked to speak with Senator Edward Kennedy.

In the meantime, relatives of the Lekan family went to the Brunswick police station to offer assistance. Beverly Lekan's mother and sister pleaded with the police to be allowed to speak with Mr. Lekan to calm the situation. The police, however, refused to allow any family members to speak with Mr. Lekan.

Between 7:00 and 7:30 p.m., Chief Beyer requested an assessment from James Polzner, a mental health professional at the scene. Polzner had been monitoring conversations between Sergeant Solar and Mr. Lekan. Polzner told Chief Beyer that the threat level was high. Chief Beyer then asked if the officers at the scene had a reason not to pursue a tactical solution to the standoff. Beyer asked for input from another psychologist on the scene, who responded by asking rhetorically why Beyer was considering a tactical assault.

Ultimately, Chief Beyer decided to order an armed entry into the Lekan house. Pursuant to the assault plan, the ERT team threw incendiary devices into the house while using a battering ram to break open the front door. Tear gas was also used during the assault. The plan failed when one of the incendiary devices ignited a fire in the entrance hall and the lead officer stopped to put out the fire. The police lost the initiative as a result. Mr. Lekan exchanged gunfire with the police, and two more officers were injured. The police ultimately retreated and the standoff continued.

At approximately 3:00 a.m., Solar spoke again with Mr. Lekan and asked to talk to Mr. Lekan's son, J.T. Mr. Lekan put J.T. on the telephone. J.T. told Solar that he was fine and

that he was scared. Mr. Lekan then took the telephone and asked to speak to his cousin, who is a priest. Solar told Mr. Lekan that he could speak to his cousin if he left the house. Mr. Lekan said "[t]hat's not part of the scenario" and hung up. J.A. at 136 (Solar Aff. at 4). Solar consulted with another negotiator from the Southwest Enforcement Bureau, and they concluded that the request to speak to a priest was a danger sign indicating that Mr. Lekan might be contemplating a murder-suicide ritual.

Shortly thereafter, an armored vehicle from the Cleveland Police Department arrived on the scene. Chief Beyer ordered the armored vehicle to drive onto the front lawn and illuminate the Lekan house. Officers inside the vehicle attempted to communicate with Mr. Lekan over a loudspeaker, but received no response. Later that morning, the armored vehicle rammed through the living room wall and injected more tear gas into the house in hopes of eliciting a response from Mr. Lekan. Between 4:00 and 5:00 a.m., the police heard gunshots coming from inside the residence. At 11:00 a.m., Chief Beyer ordered the vehicle to push through the garage door. There was still no response from Mr. Lekan. Finally, the police conducted another tactical rescue operation. A room-to-room search of the residence was conducted. During the search, the officers found the bodies of John Lekan and J.T. Lekan. John Lekan had shot his son and then killed himself.

The details of this standoff are well summarized in the sixty-seven-page report of William P. Callis, who was hired by the Brunswick City Council to conduct an independent review of the incident. Mr. Callis, who was a former FBI Special Agent/Hostage negotiator, notes in his "Review of Incident Involving John M. Lekan, Brunswick, Ohio, March 31-April 2, 1995, Summary," that he had the benefit of reviewing the almost four-hundred-page report about the incident which was prepared by the Brunswick Police Department. He also had the limited cooperation of the police department, and he personally interviewed numerous officers and individuals including Mrs. Lekan about the incident.

Lekan did not want anything the authorities could provide. He already had what he wanted -- his family and he was already in his own home. (emphasis in original).

Callis' also concludes that there were a number of options open to the defendants which would also negate exigent circumstances:

However, after reviewing this matter, I can't help but wonder if there was not a better way of conducting the "welfare check" at the Lekan residence. Perhaps the police could have asked a relative of Beverly Lekan's telephone her at home and once she was on the telephone, the police could speak to her to verify that she and her son were well. The identity and telephone numbers of Mrs. Lekan's relatives was available to the authorities. The visiting nurses organization that was caring for Mrs. Lekan telephoned her mother, Helen Ewolski, on the morning of March 31 to advise her that Beverly was requesting to go to a nursing home. Perhaps further investigation by the police could have determined the Lekan's health status and allowed the confrontation between the police and John Lekan to be avoided until something could be done about John's possession of firearms in his mental condition.

Although the majority finds that there was qualified immunity for the officers in this case, in the unpublished opinion of *Carpenter v. Laxton*, 99 F.3d 1138, 1996 WL 623017 (6th (Tenn.)), it was held that if the facts surrounding the existence of exigent circumstances are in dispute, and a rational jury could draw more than one inference from the conflicting facts, there are also genuine issues of material fact regarding whether or not the officers are entitled to qualified immunity. Therefore, I believe summary judgment in regard to a Fourth Amendment violation was inappropriate and the issues of exigent circumstances and qualified immunity should have been submitted to a jury.

that, given the evidence on the matter, there is room for a difference of opinion." *Id.* at 997.   In the case before us, the district court *expressly recognized an existing material dispute of fact* in regard to exigent circumstances as follows:

> Defendants contend that exigent circumstances justified the warrantless entry because Mr. Lekan presented an immediate threat to his family.  Plaintiffs disagree on the basis that, prior to visiting the home, defendants admitted there was no probable cause to arrest Mr. Lekan and no exigent circumstances existed.   Further, the officers never saw a crime being committed, nor did they hear Mr. Lekan threaten anyone.

Based upon this material dispute of fact, there is room for a difference of opinion on the issue of exigent circumstances and this issue was for a jury.

This dispute of fact is further bolstered by the report of William Callis which is significant because he was hired by the defendant City of Brunswick to conduct an independent review of the incident.  In addressing exigent circumstances, although the majority finds that this was a hostage situation, in his report prepared for the defendants, Callis' explains why this incident did not involve a hostage situation:

> Upon reviewing this situation, I am of the opinion that the Lekan matter was not a hostage situation.  **A hostage is defined as a person held and threatened by a subject to force the fulfillment of certain substantive demands on a third party**.  In this situation, there was not a threat by Mr. Lekan to harm Mrs. Lekan or their son, nor was there a substantive demand by Mr. Lekan.  Therefore, it appears that Beverly Lekan and her son, John T. Lekan, were not actually hostages, but were *victims* of Mr. Lekan's actions.   They were in the residence when Mr. Lekan committed his criminal act and he afforded them no opportunity to leave.
> Many hostage situations involve a negotiation process -- or bargaining approach – to meet certain demands.  In this situation, there were no substantive demands as Mr.

In his summary, Callis addressed the "tactical operations" which took place during the standoff, and concluded:

> In summary, as I have set forth above, I don't believe this matter could have been resolved through the traditional form of hostage negotiations.  I believe that John Lekan set out on a path of self destruction when he shot Officer Puzella on that Friday afternoon.  I believe that John Lekan was willing to die "protecting" his home and his son and, because of his mental disorder, I think he believed he was doing just that - protecting himself, his home, and his family.

J.A. at 514 (Callis Report at 67).  Callis noted that he had three criticisms in regard to the tactical operations:

> 1.   I believe the tactical entry into the Lekan residence was conducted too soon into the stand off.
> 2.   I believe it was a mistake to try to use the armored vehicle to overwhelm John Lekan into surrendering.
> 3.   I believe it was a mistake to interrupt the tactical entry to try to deal with the fire in the front door.

J.A. at 514.

The record also includes the thirteen-page report of James J. Fyfe Ph.D., who was retained as plaintiffs' expert.  In his report, Dr. Fyfe notes that he reviewed police investigative reports, the report of William Callis, and the depositions of six officers who were involved in the incident.  He agrees with many of the statements and conclusions contained in the Callis summary, and notes numerous violations of generally accepted police custom and practice in regard to the initial entry of the Lekan home and the resulting standoff.   In addition, his report details the inadequacy of the Brunswick Police Department's policies and training regarding encounters with emotionally disturbed persons.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment to the defendant officers de novo. *Aiken v. City of Memphis*, 190 F.3d 753, 755 (6th Cir. 1999), *cert. denied*, 528 U.S. 1157 (2000). Summary judgment is proper only when there is no dispute as to a material question of fact and one party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). Viewing all facts and inferences drawn therefrom in the light most favorable to the nonmovant, this court then determines whether the evidence presented is such that a reasonable jury could find for that party. *Aiken*, 190 F.3d at 755 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.  Qualified Immunity Claims Against Individual Officer Defendants

Appellant's claims against the individual officers of the Brunswick Police Department must be evaluated under the framework of qualified immunity. According to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity involves a two-step inquiry. First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. If the court finds a constitutional violation, it must then consider whether the violation involved "'clearly established constitutional rights of which a reasonable person would have known.'" *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995)); *see also Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156 (2001). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a

_____

### DISSENT

_____

THOMAS GRAY HULL, District Judge, dissenting. Respectfully, I dissent. I believe the issue of exigent circumstances and qualified immunity were issues for the jury. Citing *O'Brien*, the district court addressed the issue of exigent circumstances as follows:

Exigent circumstances exist only where "real, immediate and serious consequences ... would certainly occur were a police officer to postpone action to get a warrant." *O'Brien*, 23 F.3d 990, 997 (6th Cir. 1994) (citations omitted); *Welsh* 466 U.S. at 751. The issue, then, is whether Mr. Lekan posed a threat to his family that was both real and immediate.

This issue is particularly disturbing because of the way the Brunwick [sic] police department chose to handle the 'situation.' They sent two police officers to the house posing as civilians (one in jeans and a sweatshirt) on the off chance that Mr. Lekan - a known paranoid might let these strangers in to "talk to his wife." A stable person would not have let them in. To think their chances of entry might increase after unsuccessfully attempting to deceive him and then claiming to be police officers was simply foolhardy. The police could have chosen any number of other, less confrontational, ways to check on Mrs. Lekan and her son. Although this particular incident appears to have triggered the unfortunate series of events that followed, the Court must determine whether exigent circumstances existed at the precise moment the officers entered the house.

Although the district court cites *O'Brien* for the definition of exigent circumstances, and concludes that this is a decision for the court, *O'Brien* also teaches that whether exigent circumstances existed "is a question for the jury provided

believe that the Appellant's version of the facts does not establish culpability rising above negligence. Therefore, we affirm the district court's decision to award summary judgment as to the Appellant's wrongful death claims.

### III. CONCLUSION

In sum, we **AFFIRM** the district court's grant of summary judgment to the Defendants-Appellees on all claims asserted by the Plaintiff-Appellant.

reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "Although it need not be the case that 'the very action in question has been previously held unlawful, . . . in light of pre-existing law, the unlawfulness must be apparent.'" *Id*. (quoting *Anderson*, 483 U.S. at 640). Whether qualified immunity is applicable to an official's actions is a question of law that is reviewed de novo. *See Dickerson*, 101 F.3d at 1157.

#### 1. Warrantless Entry

Turning first to the Appellant's warrantless entry claim against Officers Puzella and Schnell, we conclude that the district court correctly found that exigent circumstances existed to justify a warrantless entry. A police officer's entry into a home without a warrant is presumptively unconstitutional under the Fourth Amendment. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994). Warrantless entries are permitted, however, where "exigent circumstances" exist. *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992). Exigent circumstances exist where there are "'real immediate and serious consequences' that would certainly occur were a police officer to 'postpone[] action to get a warrant.'" *O'Brien*, 23 F.3d at 997 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984)). The relevant inquiry is whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed. *Dickerson*, 101 F.3d at 1158. Three types of circumstances have traditionally been found to constitute exigent circumstances: "(1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers and public; (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Hancock*, 958 F.2d at 1375.

Although the determination of exigent circumstances is normally a question for the jury, "in a case where the underlying facts are essentially undisputed, and where a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law." *Id.* In *Hancock*, we found that exigent circumstances existed as a matter of law where the police received a call concerning a suicidal and possibly homicidal gunman, shots had been reported fired, and at least one radio communication indicated that the gunman had threatened to kill any police officers who arrived. *Id.* Similarly, in *Dickerson*, 101 F.3d at 1160, we concluded that summary judgment based upon exigent circumstances was appropriate where the police made an unannounced forcible entry while responding to a call reporting that a drunken man was screaming and had fired shots in his house. Although it was later determined that the suspect was alone in his house and was screaming into the telephone, we determined that it was reasonable for the police to believe that someone was in the house and was in immediate peril of bodily harm given the presence of a firearm and the suspect's apparent willingness to use his weapon. *Id.*

Similar facts were present here. The district court relied upon facts which showed that at the time of the initial entry:

> the officers had credible evidence that (1) John Lekan was a mentally disturbed man who was volatile, dangerous and not taking his prescribed medication, (2) he recently began brandishing a shotgun in front of home health care personnel in a threatening manner, (3) he told his brother the night before that his guns were "loaded and ready," (4) he inexplicably kept his son home from school that day, and (5) his wife unexpectedly asked to be put into a nursing home that morning.

J.A. at 62 (Dist. Ct. Op. at 11). In addition, the undisputed evidence showed that Officers Puzella and Schnell observed Mr. Lekan behaving erratically immediately prior to their

for review,' and [a]n argument' on each issue presented." *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996), *cert. denied*, 519 U.S. 1093 (1997). Appellant's brief on appeal does not specifically mention any of these claims, nor does it contain any argument as to why the district court's determination that summary judgment was appropriate on these claims was in error. The Appellant's argument section, Appellant's Br. at 55, suggests that the district court's decision to dismiss the state law claims should be reversed based upon the same arguments asserted as to the Appellant's constitutional claims. The district court's opinion, however, quite clearly based its conclusions as to the state law claims upon different grounds than its constitutional rulings.[8] These grounds are not addressed anywhere in the Appellant's brief. Therefore, we decline to consider them.

Read liberally, the Appellant's brief does address the district court's grant of summary judgment as to the wrongful death claims, insofar as it challenges the district court's conclusion that the deaths of Mr. Lekan and his son were not proximately caused by the defendants. Nevertheless, as employees of a political subdivision, the individual defendants are entitled to statutory immunity unless their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." OHIO REV. CODE ANN. § 2744.03(A)(6)(b) (Banks-Baldwin West 2001). The standard for recklessness employed by Ohio courts holds that "[t]he actor's conduct is in reckless disregard of the safety of others if . . . such risk is substantially greater than that which is necessary to make his conduct negligent." *Fabrey v. McDonald Village Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994) (quotation omitted). As we have already explained, we

---

[8]The one exception to this observation is the district court's discussion of the trespass claim. J.A. at 75-76 (Dist. Ct. Op. at 24-25). The sole grounds asserted by the district court for granting summary judgment on the trespass claim was its conclusion that exigent circumstances justified the officers' warrantless entry. Because we also conclude that exigent circumstances existed as a matter of law, we affirm the district court on this claim.

paranoid schizophrenic, even if the vehicle previously had been used successfully in dealing with individuals who were not mentally ill. Troubled as we are by the conduct of the police in this standoff, however, imprudence and poor execution do not rise to the level of constitutionally arbitrary abuses of power. We therefore conclude that the district court correctly granted summary judgment to the defendants as to the Appellant's Fourteenth Amendment claim.

## C.  Municipal Liability

Having concluded that the Appellant has not shown a genuine issue of material fact as to any of the asserted constitutional claims, we therefore conclude that the district court correctly dismissed the Appellant's municipal liability claims. Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."). Because no such constitutional violation has been shown, we affirm the district court's decision granting summary judgment to the City on the Appellant's municipal liability claim.

## D.  State Law Claims

We also hold that the Appellant's state law claims were properly dismissed. Initially, we conclude that the Appellant's claims for assault and battery, intentional infliction of emotional distress, and civil conspiracy were waived by the Appellant's failure to address them in his brief to this court. *See Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999) (finding plaintiffs appealing summary judgment in § 1983 action had waived a number of their state law tort claims by failing to address them in their appellate briefs). "Federal Rule of Appellate Procedure 28(a) requires that an appellant's brief include 'a statement of the issues presented

decision to enter.[1] He asserted the Fifth Amendment when asked about his wife and sang the *Star Spangled Banner*. When Officers Puzella and Schnell identified themselves as police officers, he slammed the door. We agree with the district court that "[o]ne could reasonably construe this as a sign that Mr. Lekan was hiding something, holding his family hostage, or preventing the police from [stopping] whatever action he had planned." J.A. at 63 (Dist. Ct. Op. at 12). This dramatic reaction, combined with the officers' knowledge that he was armed and volatile and that his wife and child were in the house with him, reveals an undisputed body of evidence from which a reasonable officer could have reasonably concluded that there was an immediate threat to Mr. Lekan's wife and son.

The danger to Mr. Lekan's family makes this an even stronger case for exigent circumstances than *Hancock*, 958 F.2d 1367, where there was no evidence of any potential hostages.[2] The presence of hostages also distinguishes the

---

[1] We respectfully disagree with Judge Hull's characterization of the district court opinion as having "*expressly recognized an existing material dispute of fact* in regard to exigent circumstances." (Dissent at 40). The portion of the district court opinion excerpted in Judge Hull's dissent merely restates the plaintiff's claims that the police were not aware of exigent circumstances before arriving at the Lekan house and that the police did not directly witness a crime being committed or Mr. Lekan threatening anybody. As is explained in this opinion, *infra*, and in the district court opinion, these facts do not raise a genuine issue as to whether exigent circumstances existed *at the time the police made the decision to enter the Lekan house*. The district court, therefore, did not "expressly recognize" a genuine issue of material fact, as it ultimately granted summary judgment to the defendants on the plaintiffs' Fourth Amendment claims.

[2] Our use of the term "hostage" is intended merely to signify that Mrs. Lekan and her son were under the control of Mr. Lekan, who was armed and potentially homicidal, and were in serious danger of being harmed. We recognize that this may differ from the definition of "hostage" employed in the Callis report, which requires that the "hostage" be used to secure substantive demands in a bargaining process. Nevertheless, we disagree with Judge Hull that the fact that Mr. Lekan was not making

instant case from those cited by the Appellant in which this court declined to find exigent circumstances. *See O'Brien*, 23 F.3d at 997-98 (finding absence of exigent circumstances where no hostages were present); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (holding that no exigent circumstances were present once hostages had been secured and removed from danger). The importance of the potential danger to innocent people in the house is apparent from our opinion in *Dickerson*, 101 F.3d at 1160, which emphasized the reasonable belief that a hostage could be present in the house — even though this turned out to not be the case — in finding that exigent circumstances existed as a matter of law. In the instant case, the police had actual knowledge that Mr. Lekan's wife and son were inside, and the apparent threat to them was enhanced by the fact that Mrs. Lekan had earlier sought to be taken out of the house and that Mr. Lekan had kept his son home from school.

The Appellant emphasizes that the police admitted that exigent circumstances were not present before they arrived at the Lekan home, and that the police never saw a crime being committed and did not hear Mr. Lekan threaten anyone. As the district court correctly observed, however, the fact that exigent circumstances did not exist at some earlier point in time is irrelevant, since our inquiry is limited to whether exigent circumstances existed at the moment the police entered the residence. *United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir. 1984), *cert. denied*, 471 U.S. 1061

---

substantive demands, and therefore was not technically holding his family "hostage" in the sense that term is used by Callis, creates a material fact question as to the existence of exigent circumstances. The key issue in determining whether exigent circumstances existed is whether the officers reasonably believed that "the suspect represented an immediate threat to the . . . public," *Hancock*, 958 F.2d at 1375, not whether the suspect was making substantive demands in connection with such a threat. As to this question, the portion of the Callis report quoted in Judge Hull's dissent concedes that although Mrs. Lekan and her son "were not actually hostages," they "were *victims* of Mr. Lekan's actions. They were in the residence when Mr. Lekan committed his criminal act and he afforded them no opportunity to leave." J.A. at 496.

cases such as this one in which officers must choose among risks, a plaintiff must show that the police "knowingly and unreasonably" opted for a course of conduct that entailed a substantially greater total risk than the available alternatives. *Farmer*, 511 U.S. at 846. Although, in hindsight, we may agree that the decisions made were ill-advised, and may also agree that Chief Beyer was negligent in failing to better inform himself before making the decision, this would not lead to the conclusion that he callously disregarded the risk of injury to the Lekan family.

Appellant's allegation that better equipment, such as thermal imaging technology, which could have improved the chances for a successful assault, would have been available to Chief Beyer if he had waited longer to order the assault is similarly unavailing. A state official's decision to initiate a rescue with suboptimal equipment sounds in negligence, not deliberate recklessness. *See Salas*, 980 F.2d at 309-310. Indeed, in the instant case, the Appellant has not contradicted Chief Beyer's deposition testimony that he had no way of knowing that thermal imaging equipment would later become available. Therefore, his decision to act without the benefit of such equipment cannot be said to be deliberate.

There can be little doubt that the facts of the instant case show that the actions of the police were, in many instances, ill-advised and poorly executed. Like the district court, we are not convinced that it was necessary or prudent to undertake a tactical assault only five hours into the standoff with Mr. Lekan, particularly since he had by all accounts retreated from the confrontation and did not appear to be posing an immediate threat to his family or the police. The experts in this case seem to agree with the district court that "[a]rmed tactical solutions are radical strategies used only as a last resort in hostage situations," and that "[u]se of it here was premature." J.A. at 70 (Dist. Ct. Op. at 19 n.12). Moreover, the assault itself was poorly planned, and it appears that the police lacked the personnel and equipment to carry it out successfully. The decision to deploy an armored vehicle seems particularly imprudent when confronting a

boat] from endangering her life in the course of a police rescue effort." *Id.* at 1271.

Finally, in *Kepner v. Houstoun*, 164 F. Supp. 2d 494 (E.D. Pa. 2001), the court addressed a factual situation closely analogous to the instant case. In *Kepner*, an armed individual who was also a diagnosed schizophrenic took his former employer and another person hostage and barricaded himself in the employer's office. A two-day standoff ensued. The police ultimately decided to undertake a tactical assault, after the hostage-taker's demands became increasingly erratic. As the police stormed the office, the hostage-taker shot and killed one of the hostages. *Id.* at 497. The court found that the conduct of the police in undertaking a tactical assault did not shock the conscience under either the intent to harm or the deliberate indifference standard. *Id.* at 500. As the court explained:

> While their action surely had grave risks, taking no action also had grave risks. It is important to remember that Czajkowski, with serious mental problems, had previously shot Jordan and was making demands that were becoming increasingly bizarre. In hindsight, maybe the state police were negligent and should have taken a different path, but negligence is not the applicable constitutional standard.

*Id.*

Viewing the instant facts in light of the foregoing cases, we conclude that the Appellant has not shown sufficient facts to support a claim of deliberate indifference. Here, the police attempted to rescue Mrs. Lekan and her son from a threat of private violence. It is undisputed that there was no clear way out of danger, and any course pursued by the police entailed significant risks. The Appellant, at best, has shown that Chief Beyer should have obtained more information from the mental health professionals on the scene and may have made an incorrect assessment of the risks as a result. Deliberate indifference, however, requires that the police act in conscious disregard of a known risk of serious injury. In

(1985). Moreover, this court has never held that the police must witness a crime for exigent circumstances to be present. In *Hancock*, 958 F.2d at 1375, for example, the defendant officers' information regarding exigent circumstances was limited to reports they received from a radio dispatch. Where, as here, an armed and volatile individual poses an obvious threat to another, we do not believe the Fourth Amendment requires the police to stand idly by until they actually observe a criminal act. Similarly, although the police may not have personally heard any threats, they were aware of Mr. Lekan's threatening behavior. Moreover, the undisputed evidence indicates that Officer Schnell was aware of Mr. Lekan's statement that his guns were "loaded and ready."

We are also unpersuaded by the Appellant's claim that the defendant officers impermissibly created the exigent circumstances by initially attempting to see Mrs. Lekan without identifying themselves as police officers. The Appellant relies upon *United States v. Morgan*, 743 F.2d at 1163, in which we observed that "[p]olice officials . . . are not free to create exigent circumstances to justify their warrantless intrusions." The *Morgan* case, however, is easily distinguished. In *Morgan*, the police surrounded the home of a person suspected of possessing illegal firearms and flooded the house with lights while summoning the suspect with the "blaring call of a bullhorn." *Id.* at 1161. The suspect exited the house carrying a pistol, which he then set down inside the doorway of the house. The police arrested him and then searched the house, seizing a number of firearms, including the pistol. *Id.* We held that the warrantless search of the home was not justified by exigent circumstances. We explained that "[t]here was no substantiated evidence that Morgan was dangerous or that a grave offense or crime of violence had occurred or was even threatened." *Id.* at 1163. We emphasized the lack of any demonstrated need for immediate action, noting that the police had sufficient time to meet at a local coffee shop and "assess[] the situation," before deciding to surround the house. *Id.* at 1162. Under these circumstances, we found that the mere possibility that the suspect would react with hostility to the dramatic actions of

the police could not, by itself, create sufficient exigent circumstances to justify a warrantless search. *Id*. at 1163. In the instant case, by contrast, Officers Puzella and Schnell did have reason to believe that there was a danger of violence. Although this threat may have risen to the level of exigent circumstances only after the officers identified themselves to Mr. Lekan, the risk to Mrs. Lekan and her son was not created solely by the officers' conduct, as in *Morgan*. Moreover, this risk to Mrs. Lekan and her son reasonably justified the belief that there was a need to investigate the situation relatively quickly. This fact distinguishes the instant case from many created-exigency cases, which have reasoned that the police cannot claim there was insufficient time to seek a warrant if the evidence shows that the police controlled the timing of the encounter giving rise to the search. *See United States v. Campbell*, 261 F.3d 628, 633-34 (6th Cir. 2001) (noting that in cases from the Eighth Circuit holding controlled deliveries to be exigent circumstances created by the police, "the police had the opportunity to obtain a search warrant prior to executing the controlled delivery at that dwelling, but chose not to do so."); *U.S. v. Cresta*, 825 F.2d 538, 553 (1st Cir. 1987) ("Thus, the agents could not have controlled the time at which the fake delivery took place, which is a necessary element to a finding that the government deliberately created the exigent circumstances."), *cert. denied*, 486 U.S. 1042 (1988).

Moreover, the created-exigency cases have typically required some showing of deliberate conduct on the part of the police evincing an effort intentionally to evade the warrant requirement. *See Campbell*, 261 F.3d at 633 ("This Court has struck down warrantless entries by the police in situations where deliberate conduct on the part of police officers has created the claimed exigent circumstances."); *United States v. VonWillie*, 59 F.3d 922, 926 (9th Cir. 1995) ("This is not a case where the government purposely tried to circumvent the requirements of [the knock and announce statute].").  The Appellant has presented no evidence to indicate that Officers Schnell and Puzella made a deliberate effort to incite Mr. Lekan, so as to create a threat to Mrs. Lekan and her son that

with a hostage negotiating team and a SWAT team, were the first to respond after the husband stormed his wife's office and took her hostage. Before the city police could deploy, however, the county sheriff ordered them to leave, asserting his exclusive jurisdiction over courthouse security. *Id.* at 302. The sheriff's department did not possess the same experience, capabilities, or equipment for dealing with hostage situations that were possessed by the city police. After unsuccessful efforts to negotiate a resolution, the gunman killed his wife and then himself. The Fifth Circuit concluded that the actions of the sheriff did not rise to the level of conscience-shocking behavior. *Id.* at 309. The Court reasoned that the officers did not "cut off all avenues of rescue . . . without providing an alternative." *Id.* at 308. Rather, the officers "controlled the conduct of a police rescue, considering factors such as the safety of those involved." *Id.* The mere fact that the sheriff's department did not possess the best available equipment did not render the decision to handle the standoff conscience shocking. *Id.* at 310.

In *Andrews*, 934 F.2d at 1269, the D.C. Circuit addressed a Fourteenth Amendment claim asserted on behalf of a suspect who drowned while attempting to evade the police. The suspect dove into a channel after being confronted by a police officer. When the suspect began to drown, the officer hailed a private boat to assist the man. Seeing that the suspect was unconscious, a woman on the boat told the officer she needed to dive in to save him, and informed the officer that she had been trained to execute such a rescue. *Id.* The officer directed her not to go into the water, because the drowning man was an escaped prisoner and could be dangerous. *Id.* The court concluded that the officer's action of interfering with the private citizen's rescue effort did not demonstrate a reckless disregard for the suspect's safety. *Id.* at 1271. The court explained that it is not a constitutional violation "for a state officer to attempt an ineffectual rescue," and therefore mere negligence on the part of the officers in the conduct of the rescue did not state a Fourteenth Amendment violation. *Id.* at 1270. Moreover, the court explained "the police were entitled, if not obliged, to prevent [the private citizen on the

further explained that he perceived that his officers were tiring and potentially losing their edge, which could have made it more difficult to conduct successfully a tactical operation later. In addition, Chief Beyer had some reason for confidence that a tactical assault could succeed, based upon his knowledge of the past success of the City's emergency team. Moreover, it seems from the record that everyone agreed at the time that there was little, if any, prospect for successful resolution to the crisis through negotiation. Mr. Lekan made no demands and was not communicating coherently with the negotiator. Given the grim prospect for negotiations, it was reasonable for Chief Beyer to conclude that a tactical solution would be required eventually.

Viewed against this backdrop, we do not think it would be appropriate to say that Chief Beyer acted with callous indifference to the risk of injury to Mrs. Lekan or her son. Instead, it appears that Chief Beyer made a decision that required a balancing of the risks presented by aggressive action against the risks presented by further delay. This is not a situation where the police deliberately refused to take obvious steps that would decrease the risk or abandoned the Lekans in a dangerous environment. *See Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 531 (5th Cir. 1994). Instead, the Appellant challenges Chief Beyer's choice among necessarily risky alternative tactics in undertaking an effort to rescue Mrs. Lekan and her son from danger. Merely demonstrating that Chief Beyer incorrectly assessed the competing risks may demonstrate negligence on Chief Beyer's part, but it is not enough to show a callous disregard for the safety of Mrs. Lekan and her son. *Id.*

Cases from other circuits dealing with unsuccessful police rescue efforts are instructive. *See, e.g., Salas v. Carpenter*, 980 F.2d 299, 308 (5th Cir. 1992); *Andrews v. Wilkins*, 934 F.2d 1267, 1271 (1st Cir. 1991). In *Salas*, 980 F.2d at 302-03, the Fifth Circuit addressed a substantive due process claim asserted on behalf of a woman who was killed by her husband after a day-long standoff with the police at the courthouse where the victim worked. City police, equipped

could justify a warrantless search. Instead, the undisputed evidence indicates that the officers had reasonable grounds to be concerned for the safety of Mrs. Lekan and her son, but did not possess probable cause sufficient to obtain a warrant. Under these circumstances, it was reasonable to go to the Lekan home and attempt to learn more through consensual questioning of Mr. Lekan. *United States v. Jones*, 239 F.3d 716, 720 (5th Cir.) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."), *cert. denied*, --U.S.--, 122 S. Ct. 142 (2001). When an officer observes facts giving rise to exigent circumstances in the course of such a consensual encounter, it usually cannot be said that the officer impermissibly "created" the exigent circumstances. *Id.* Although Officers Schnell and Puzella's strategic decision not to identify themselves immediately may have been ill-advised, and may even have contributed to Mr. Lekan's agitation, this conduct did not give rise to a claim that the police impermissibly created the exigency.[3]

Even if genuine issues of material fact did exist as to whether a reasonable officer would have perceived an immediate threat to the Lekans, we would still find summary

---

[3] We therefore respectfully disagree with Judge Hull's suggestion that the Callis report's criticisms of the Brunswick Police Department's "welfare check" procedure creates a genuine issue of material fact as to the question of exigent circumstances. The portion of the Callis report quoted in the dissent merely states that the police should have used different methods to discern what risk, if any, Mr. Lekan posed to his wife and son, and that different police tactics might have avoided the confrontation between Mr. Lekan and the police. The fact that Mr. Lekan might not have been provoked to such volatile behavior if the police had not gone to his home in plain clothes, however, does not dispute that exigent circumstances were present when Mr. Lekan ultimately *did* exhibit this volatile behavior. In the absence of facts suggesting that the police impermissibly "created the exigency" as that concept is understood in Fourth Amendment jurisprudence, whether or not police tactics were part of the causal chain resulting in the exigency is not material to the question of whether the warrantless entry was justified by exigent circumstances.

judgment to be appropriate on the basis of the "clearly established" prong of the qualified immunity test. As the above discussion indicates, we can find no controlling authority where a court has held similar conduct to be unconstitutional "under facts not distinguishable in a fair way from the facts presented in the case at hand." *Saucier*, 121 S. Ct. at 2157. In *Russo*, 953 F.2d at 1043-44, we held that the defendant police officers were entitled to qualified immunity on the plaintiff's warrantless entry claims, where the undisputed facts showed that the suspect was mentally disturbed, the suspect possessed two knives, a radio call had described the suspect as suicidal, and the suspect had turned out the lights and gone silent immediately before the officers' decision to enter. We explained that, even if the officers' actions were unreasonable, we were not aware of "a single case indicating that an officer's attempt to rescue what that officer believes to be a suicidal person does not constitute exigent circumstances." *Id.* at 1044. We are not aware of any such case that has issued since *Russo*. Certainly, then, a reasonable officer could not anticipate that a court might decide exigent circumstances were absent where the danger of suicide was compounded by an apparent threat to the suspect's family. Therefore, summary judgment for the officers on the grounds of qualified immunity is appropriate regarding the warrantless entry claim.

## 2. Excessive Force

The district court rejected the Appellant's Fourth Amendment excessive force claim on the grounds that there was not a "seizure" of either Mr. Lekan or his family. J.A. at 65-66 (Dist. Ct. Op. at 14-15). As the court noted, the Fourth Amendment protects against only unreasonable seizures, it is not a guarantee against unreasonable or outrageous official conduct generally. *See Galas v. McKee*, 801 F.2d 200, 202 (6th Cir. 1986). Therefore, to assert a successful Fourth Amendment claim, the plaintiffs must first show that there was a seizure. *See id.* The district court concluded that none of the Lekans were seized by the police. We determine that the district court erred insofar as it found that Mr. Lekan was

U.S. 825, 837 (1994); *see also Stemler v. City of Florence*, 126 F.3d 856, 865, 870 (6th Cir. 1997) (applying *Farmer*'s deliberate indifference standard to Fourteenth Amendment claim in non-institutional setting), *cert. denied*, 523 U.S. 1118 (1998). Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Having drawn the inference, the official must act or fail to act in a manner demonstrating "reckless or callous indifference" toward the individual's rights. *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 797 (1st Cir. 1990).

From the record, there is little doubt that Chief Beyer drew the inference that aggressive tactics might provoke Mr. Lekan to respond in a dangerous manner toward his wife and child. In his deposition, Chief Beyer quite frankly explained that "[t]hat possibility [of a violent reaction] existed throughout the entire crisis situation, so we were concerned that that was in fact what would happen." J.A. at 393 (Beyer Dep. at 198). Chief Beyer also indicated that he considered the possibility of a murder-suicide reaction when evaluating the advisability of initiating an assault with the armored vehicle, but he hoped that Mr. Lekan "would take his aggressive action out on the police." J.A. at 396-97 (Beyer Dep. at 206-07).

It seems clear from the record, however, that Chief Beyer also knew that further delay and inaction also posed substantial risks. The Callis report, for example, concluded that although, on balance, a strategy of stalling for time generally is the best to reduce risks to hostages, stalling has its own drawbacks and risks. The undisputed facts suggest that these risks and drawbacks factored into Chief Beyer's decisions to initiate a tactical assault and deploy the armored vehicle. Prior to ordering the first assault, Chief Beyer consulted a mental health professional on the scene who informed him that the threat level was high. Chief Beyer

*Id.* at 840.

To hold otherwise would effectively give the police free licence to take *any* risk with the lives of hostages in an armed standoff situation, as long as they did not act maliciously and sadistically with the intent to cause harm. The district court noted this same concern, explaining that it did "not believe that, because Mr. Lekan was armed and dangerous, the defendants could attempt to restore order by any means whatsoever so long as they did not intend to hurt the Lekans." J.A. at 69 (Dist. Ct. Op. at 19).

Nevertheless, even under the more exacting deliberate indifference standard, we conclude that the Appellant has not shown a genuine issue of material fact as to whether the conduct of the police rose to the level of the conscience shocking under the particular circumstances presented. Deliberate indifference has been equated with subjective recklessness, and requires the § 1983 plaintiff to show that the state "official knows of and disregards an excessive risk to [the victim's] health or safety."[7] *Farmer v. Brennan*, 511

---

Mr. Lekan alone, and it is undisputed that Mr. Lekan was contained within his house and surrounded by a vastly superior police presence. Moreover, the Court's opinion in *Whitley* suggests that its reasoning may not apply outside the institutional setting of the prison. The *Whitley* Court based its conclusions in large part on the deference traditionally afforded to prison administrators in maintaining discipline and security, *id.* at 321-22, and was careful to limit its holding — insofar as it defined the scope of Fourteenth Amendment protections — to prison inmates. The Court explained that "[b]ecause this case involves prison inmates rather than pretrial detainees or persons enjoying unrestricted liberty we imply nothing as to the proper answer . . . outside the prison security context by holding, as we do, that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause." *Id.* at 327.

[7]Of course, an official's subjective awareness of a risk may be proved circumstantially by evidence suggesting that "the defendant official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer*, 511 U.S. at 842. Moreover, "the concept of constructive knowledge is familiar enough that the term 'deliberate indifference' would not, of its own force, preclude a scheme that conclusively presumed awareness from a risk's obviousness."

---

not seized during the standoff, although we agree with the district court's conclusion that Mrs. Lekan and her son were not seized. Nevertheless, we conclude that the Appellant has not demonstrated a genuine issue of material fact as to whether excessive force was used against Mr. Lekan.

A Fourth Amendment seizure occurs when a police officer restrains the liberty of a citizen in such a way that a reasonable citizen would reasonably believe under the circumstances that he or she was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). A violation of the Fourth Amendment requires the "intentional acquisition of physical control" of a person by a state official. *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989). A seizure does not occur, moreover, until the subject is successfully detained by physical force or a show of authority. *California v. Hodari D.*, 499 U.S. 621 (1991) (holding that boy was not seized while fleeing from pursuing police officer until officer tackled him, bringing boy under physical control); *Galas*, 801 F.2d at 202 ("Clearly, during the initial stages of the pursuit when the minor plaintiff decided to flee rather than to obey the defendant officer's directive to stop, the minor plaintiff was not restrained.").

The district court concluded that Mr. Lekan was not seized, because by barricading himself in his home he never submitted to official authority. This conclusion was in error. There can be little question under the circumstances that Mr. Lekan was not free to leave. The district court considered Mr. Lekan's case to be more closely analogous to that of a fleeing suspect, who is not under the control of official authorities. We believe, however, that Mr. Lekan's case more closely resembles the facts in *Brower*, 489 U.S. at 598. In that case, the decedent never voluntarily submitted to official authority, but was restrained nonetheless when he collided with a police roadblock set up for the purpose of stopping him. The Court found that this act of restraint constituted a seizure for the purposes of the Fourth Amendment. *Id.* Similarly, in this case, although Mr. Lekan was never in police custody, the police surrounded the house and paraded an armored vehicle

in front of the Lekans' house. These actions qualify as an intentional application of physical force and show of authority made with the intent of acquiring physical control. Moreover, this assertion of force and authority succeeded in restraining Mr. Lekan's liberty to leave his home. Unlike the fleeing suspects in *Hodari D.* and *Galas*, Mr. Lekan was not "on the loose." By way of illustration, Mr. Lekan clearly would have been seized for the purposes of the Fourth Amendment had the police nailed shut the doors and windows of his house with him inside. The actions of the police in the instant case were no less effective in restraining Mr. Lekan's movements and, therefore, should be considered a seizure. *Cf. Fisher v. City of Memphis*, 234 F.3d 312, 318 (6th Cir. 2000) (holding that intentional application of force which immobilized automobile effectively seized all passengers). This conclusion is consistent with decisions in other circuits, which have found that police efforts to force a barricaded individual out of a home are properly treated as seizures, subject to the Fourth Amendment's reasonableness requirement. *In re City of Philadelphia Litig.*, 49 F.3d 945, 974 (3rd Cir.) (Scirica, J., concurring and dissenting) (holding that use of incendiary devices against house was seizure, as it was use of "force with the aim of gaining entry into the house or forcing the occupants out"), *cert. denied*, 516 U.S. 863 (1995); *Ginter v. Stallcup*, 869 F.2d 384, 388 (8th Cir. 1989) (holding that setting building on fire to "smoke out" barricaded suspect was subject to Fourth Amendment reasonableness test to determine whether destruction of property was warranted). Because we conclude that Mr. Lekan was seized for the purposes of the Fourth Amendment, we therefore analyze the police's actions toward him solely under the objective reasonableness test of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989) (holding that where an excessive force claim arises in the context of an arrest or investigatory stop, it should be analyzed solely under Fourth Amendment, and not Fourteenth Amendment Due Process Clause).

We conclude that the district court was correct, however, in finding that the police did not seize Mrs. Lekan or J.T. Lekan.

officers were not exchanging gunfire with Lekan at the time that the fateful decisions of that day were made.

Other courts have found that an intent to harm is required where the police fire upon an escaping suspect and inadvertently injure hostages in the process. *Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir. 2000) (holding intent to harm required where police fired upon hijacked van containing hostages in attempt to stop van as it drove through series of police roadblocks); *Lee v. Williams*, 138 F. Supp. 2d 748, 761 (E.D. Va. 2001) (intent to harm applied where armed suspects took a hostage and were attempting to escape in the hostage's van). In the instant case, however, Mr. Lekan was contained in his house and surrounded by a vastly superior police presence. The police were never forced to make a hasty decision to use force in order to prevent his escape into the community. Although Mr. Lekan did pose a danger to his family, the Appellant's version of the facts suggests that the danger was not immediate as long as Mr. Lekan was not provoked.[6]

---

[6] We note that *Whitley v. Albers*, 475 U.S. 312 (1986), which was discussed favorably in *Lewis*, could be interpreted to suggest that the more permissive "intent to harm" test applies even when there is a genuine issue of material fact as to the immediacy of the danger posed by a barricaded and armed individual. The *Whitley* Court held that "intent to harm" was the appropriate standard for assessing Eighth and Fourteenth Amendment violations in the context of a prison riot. *Id.* at 320-21. The plaintiff in *Whitley*, an inmate, was injured when guards fired shotguns into an inmate-controlled cell block in an operation to rescue a guard being held hostage. The Court concluded that the intent to harm standard was appropriate, even though "the evidence could be taken to show that the general disturbance had quieted down." *Id.* at 322-23.

Nonetheless, we think it would be inappropriate to extend the *Whitley* holding to the instant case. Initially, *Whitley* is factually distinguishable. The *Whitley* Court emphasized that the undisputed facts showed that the situation, although it had calmed somewhat, "remained dangerous and volatile." *Id.* at 323. This was based upon facts indicating that, in addition to the danger to the hostage guard, "several . . . inmates were armed . . . , numerous inmates remained outside their cells, and the cellblock remained in the control of the inmates." *Id.* Thus, according to the Court, the police were confronted with an uncontained and out-of-control prison riot. In the instant case, by contrast, the threat came from

this was a situation where actual deliberation was practical. The police waited five hours to initiate the first "tactical solution," which strongly suggests that split-second decision making was not required. Many more hours passed before the decision was made to deploy the armored vehicle. Indeed, in his deposition, Chief Beyer indicated that the decision to initiate a tactical assault was made after consulting two mental health professionals and requesting input from the officers on the scene. Beyer also indicated that he discussed the pros and cons of using tear gas. Clearly, this testimony demonstrates not only that deliberation was practical, but that some effort at deliberation was in fact made. This conclusion is supported by Callis's report, which noted that there was no need for immediate action and concluded that "[o]ne of the strongest points on the side of the authorities was 'time.'" J.A. at 642 (Callis Rep. at 6).

The time for deliberation available to Chief Beyer in deciding how to respond to Mr. Lekan's actions distinguishes this case from those cases in which actual malice and an intent to harm was required. In *Lewis*, for example, the entire course of events lasted a mere seventy-five seconds. 523 U.S. at 837. When the officers observed the victim's motorcycle approaching at high speed, they were forced to make an instantaneous decision to give chase. *Id.* at 853. Likewise, in *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), we held that a bystander injured during a police shootout must show that the police acted "'maliciously and sadistically for the very purpose of causing harm'" in order to maintain a due process claim. *Id.* at 359 (quoting *Lewis*, 523 U.S. at 853). We explained that this standard was appropriate because the police "had no opportunity to ponder or debate their reaction to the dangerous actions of the armed man" when he approached them menacingly with a weapon and then opened fire. *Id.* at 360; *see also Moreland*, 159 F.3d at 373 (holding that intent to harm standard applied when police encountered a gunfight in progress in a parking lot where 50 to 100 innocent people were caught in the crossfire). Unlike the defendants in *Claybrook*, however, Chief Beyer and his

There was no reason for either of them to believe that the police were preventing them from leaving the house. In fact, it was the clear objective of the police to remove them from the house and remove them from the control of Mr. Lekan. Their movement was restrained by Mr. Lekan (or in Mrs. Lekan's case, her own physical condition), not by the police.[4] The fact that the police exercised control over the environment in the Lekans' house does not demonstrate that Mrs. Lekan and her son were seized. The distinguishing feature of a seizure is the restraint of the subject's liberty — specifically, his or her freedom to walk away. Control over one's environment does not establish a seizure unless that control somehow restricts the subject's physical liberty. There are no facts alleged that would suggest this was the case for Mrs. Lekan or her son.

Even though we conclude that the district court erred in finding that Mr. Lekan was not seized, the Appellant has nonetheless failed to show that the officers' use of force was unreasonable. The determination of whether force used to effect a seizure was unreasonable "requires careful attention

---

[4] In his dissent, Judge Hull relies upon *Stemler v. City of Florence*, 126 F.3d 856, 868 (6th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998), in reaching the conclusion that Mrs. Lekan and her son were seized by the police. We think this case is inapposite. *Stemler* was a substantive due process case, not a Fourth Amendment excessive force case. In *Stemler*, we held that the police, by physically removing the decedent, Conni Black, from one vehicle and placing her in the vehicle operated by her intoxicated and abusive boyfriend, took affirmative action to restrain the decedent's liberty and therefore owed her a duty not to act in a manner that was deliberately indifferent to her safety pursuant to the Fourteenth Amendment's substantive due process protections. *Id.* The decedent's claims were not analyzed under the Fourth Amendment's objective reasonableness standard. Moreover, even if *Stemler* can be read to hold that the decedent was seized within the meaning of the Fourth Amendment, the factual situation presented therein is readily distinguishable from the instant case. In *Stemler*, we held that the police established custody of the decedent when they physically grabbed her and lifted her into her boyfriend's vehicle against her will. *Id.* No such act of direct physical restraint was ever taken in relation to Mrs. Lekan or her son.

to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The test is objective; it asks whether a reasonable officer would conclude that the level of force used was appropriate. *See id.* at 396-97.

Under this standard, we hold that summary judgment for the defendants was appropriate. The police used deadly force only during the tactical assault on the Lekans' home. At this point, however, it is undisputed that Mr. Lekan was firing on the officers, and he therefore posed an immediate threat to the officers. Although the facts viewed most favorably to the plaintiffs reveal that Mr. Lekan was not an immediate threat when the officers were not attempting a forcible entry, neither was there any use of deadly force at these times. Moreover, it is undisputed that Mr. Lekan was actively resisting arrest; indeed, he demonstrated that he would fire on any officers who entered the house. Under these circumstances, we can only conclude that the use of the battering ram and the incendiary devices, which were directed against Mr. Lekan's home but not his person, were objectively reasonable as applied to Mr. Lekan. At least one court has found far greater destruction of property to be reasonable at the summary judgment stage in the context of an armed and barricaded individual. *Ginter*, 869 F.2d at 389 (holding that plaintiffs failed to create a jury question as to whether burning down house where heavily armed fugitive was barricaded was unreasonable use of force). In light of Mr. Lekan's willingness to use deadly force against the police in resisting arrest, the use of non-deadly force such as tear gas and psychological tactics, while perhaps ill-considered, was not excessive under any version of the facts before us. Indeed, the Appellant has presented no evidence to indicate that Mr. Lekan was physically harmed in any way by the force exerted by the police.

make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853. The Court further explained, however, that "when unforseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id.* (quoting *Daniels*, 474 U.S. at 332). In such situations, which include high speed vehicle chases, a Fourteenth Amendment violation occurs only when the police act with malice and an "intent to harm." *Id.* at 854.

Applying this framework, we agree with the district court that this case "falls within the 'middle-range' between custodial settings and high-speed chases," and likewise conclude that, on balance, "the more appropriate standard of review is 'deliberate indifference.'"[5] J.A. at 69-70 (Dist. Ct. Op. at 18-19). Although the Brunswick police officers conducting the standoff undoubtedly faced competing obligations and intense pressures in making their decisions, the facts viewed most favorably to the plaintiffs reveal that

---

[5] We note that although the issue has never been decided, cases from this circuit decided before *Lewis* have "expressed doubt" as to whether the deliberate indifference standard should apply in noncustodial settings. *Stemler v. City of Florence*, 126 F.3d 856, 865, 869 (6th Cir. 1997), *cert. denied*, 523 U. S. 1118 (1998). Such doubt, we believe, has been resolved by the Court's opinion in *Lewis*, which made clear that the key variable is whether actual deliberation is practical, not whether the claimant was in state custody. As the Court explained, deliberate indifference applies in custodial settings because these settings provide the opportunity for reflection and unhurried judgments. *Lewis*, 523 U.S. at 853. Custodial settings, however, are not the only situations in which officials may have a reasonable opportunity to deliberate. "Like prison officials who are charged with overseeing an inmate's welfare, State officials who create or enhance danger to citizens may also be in a position where 'actual deliberation is practical.'" *Butera*, 235 F.3d at 652 (quoting *Lewis*, 523 U.S. at 851) (applying deliberate indifference standard in case in which private citizen was injured while acting as undercover operative in police investigation where facts showed that "officers had the opportunity to plan the undercover operation with care").

that Fourteenth Amendment liability will attach to "conduct *intended* to injure in some way unjustifiable by any governmental interest." *Lewis*, 523 U.S. at 849 (emphasis added). "Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or 'gross negligence' is a matter for closer calls." *Id.* (quotation and citation omitted).

Whether conduct falling within this "middle range" reaches the level of conscience shocking depends upon the facts and circumstances of the individual case. As the Supreme Court recently explained, conduct "that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850. For example, in the context of pretrial detention, the fault requirement for a due process violation may be satisfied by showing that state officials were deliberately indifferent to the basic medical needs of detainees. *Id.*; *see also Heflin v. Stewart County*, 958 F.2d 709, 716 (6th Cir.), *cert. denied*, 506 U.S. 998 (1992). By contrast, in *Lewis*, 523 U.S. at 854, the Supreme Court held that even "deliberate indifference" is insufficient to demonstrate a Fourteenth Amendment violation on the basis of police conduct during a high speed vehicle chase.

"[T]he critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 373 (9th Cir. 1998) (reviewing circuits' treatment of *Lewis* decision). As the *Lewis* Court explained, the deliberate indifference standard "is sensibly employed only when actual deliberation is practical." *Id.* at 851. The Court noted, for example, that "liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to

Even if a constitutional injury had occurred, the law is not sufficiently clearly established on this question to overcome qualified immunity. *See Russo*, 953 F.2d at 1044-45; *In re City of Philadelphia Litig.*, 49 F.3d at 972 (granting qualified immunity to police where fire used to smoke out barricaded group after gun battle, because it could not conclude that "in the light of pre-existing law the unlawfulness of either dropping the explosive or letting the fire burn should have been apparent" (quotation omitted)). In *Russo*, 953 F.2d at 1044-45, we held that the defendant police officers were entitled to qualified immunity as to the claim that they used unreasonable force in firing multiple times with a non-lethal Taser gun upon a mentally disturbed suspect wielding two knives. We noted that "although the plaintiffs' allegations may raise a genuine issue of material fact as to whether the use of the Taser was reasonable," we could not conclude that the defendant's "use of non-lethal force to subdue a potentially homicidal individual transgressed clearly established law." *Id.* In reaching this conclusion, we emphasized that the defendant "deployed the Taser in an effort to obviate the need for lethal force." *Id.* at 1044. Similarly, here the defendants did not employ lethal force, except during those occasions when Mr. Lekan fired directly upon them. We are aware of no controlling precedent since *Russo* holding that the use of non-lethal force against an armed and volatile suspect constitutes excessive force. We therefore conclude that the defendants are entitled to qualified immunity on the Appellant's excessive force claim.

### 3. Substantive Due Process Claim

We also conclude that the district court correctly determined that the conduct of the police during the two-day standoff did not violate the substantive due process rights of Beverly Lekan or her son. As the Supreme Court has explained, "'[t]he touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification . . . ." *County of Sacramento v. Lewis*, 523 U.S.

833, 845-46 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citations omitted)). The Appellant's claim is one of substantive, not procedural, due process. That is, the Appellant argues that Mrs. Lekan and her son were deprived of life and liberty as a result of the arbitrary exercise of government power — namely, the actions of the police in unnecessarily escalating the confrontation with Mr. Lekan.

The Due Process Clause of the Fourteenth Amendment is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1987). The purpose of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196. In general, therefore, the Due Process Clause does not impose liability on the State for injuries inflicted by private acts of violence. There are, however, exceptions to this general rule. First, state officials may be subject to constitutional liability if they fail to provide protection for individuals in state custody. "The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200.

Even in noncustodial settings, however, state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way. *See DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir.1994) ("[A] duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger."); *Butera v. District

*of Columbia*, 235 F.3d 637, 648-49 (D.C. Cir. 2001) ("All circuit courts of appeals . . . have by now relied on this passage in *DeShaney* to acknowledge that there may be possible constitutional liability . . . where the state creates a dangerous situation or renders citizens more vulnerable to danger." (quotation omitted)); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."). The Appellant's claim is based upon such a "state-created danger" theory. That is, the Appellant contends that the conduct of the Brunswick police in escalating the confrontation with Mr. Lekan substantially increased the danger that he would act violently toward his wife and son.

In order to establish a constitutional violation, however, it is not enough to show a causal connection between state action and an act of private violence. "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. The Appellant must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment. As the Supreme Court has explained, this requires that the § 1983 plaintiff show that the challenged action was so "egregious" that it can be said to be "arbitrary in the constitutional sense." *Id.* at 846 (quotation omitted). The Supreme Court, in elaborating upon this standard, has repeatedly instructed that the Fourteenth Amendment protects only against abuse of executive power which "shocks the conscience." *Id.*

To be sure, the "shocks the conscience" standard is "no calibrated yard stick." *Id.* at 847. At a minimum, the standard requires a showing beyond mere negligence. *Daniels v. Williams*, 474 U.S. 327, 332 (1986). "Far from an abuse of power, lack of due care . . . suggests no more than a failure to measure up to the conduct of a reasonable person." *Id.* At the other end of the spectrum, it is generally agreed