NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0153n.06
Filed: December 9, 2004

No. 03-5342

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| CHRISTY CALDWELL, ADMINISTRATRIX OF THE ESTATE OF REBECCA CAY CALDWELL, DECEASED, | ) ) ) ) | |
| Plaintiff-Appellee, | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| v. | ) ) | |
| CITY OF LOUISVILLE, | ) ) | |
| Defendant-Appellant. | ) ) | |

Before: KRUPANSKY,[*] COLE, Circuit Judges; COOK, District Judge.[**]

COOK, District Judge. The Appellant, Christy Caldwell, the Mother and Administratrix of the Estate of Rebecca Cay Caldwell, deceased, initiated this cause of action on April 4, 2001, with the filing of a complaint against the City of Louisville ("City") in the United States District Court for the Western District of Kentucky. In this lawsuit, she claims that her deceased daughter, Rebecca Cay Caldwell,[1] was (1) denied her constitutional right to substantive due process, as

---

[*]The Honorable Robert B. Krupansky participated in oral argument on this case but did not participate in this decision due to his untimely death on November 8, 2004.

[**] The Honorable Julian Abele Cook, Jr., United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] For purposes of clarity and to avoid any confusion with her mother, Rebecca Cay Caldwell will be identified in the text of this opinion only as "Rebecca."

guaranteed by the United States Constitution, and (2) fatally injured as a direct result of the City's negligence, as defined by Kentucky law.[2]

On February 26, 2003, the district court rejected both of her claims and entered a summary judgment after concluding, in part, that (1) no reasonable finder of fact would determine that the City's culpability had risen to the level of "conscience shocking," and (2) the requisite elements for a claim of negligence under Kentucky law could not be satisfied.

For the reasons that have been outlined below, we affirm, in part, and reverse, in part, the decision of the district court.

I.

This case involves a domestic dispute that began on July 4, 2000 when Rebecca called the Louisville Police Department ("LPD") and reported that she had been physically assaulted by her live-in boyfriend, Benjamin Mills. The call was immediately processed and forwarded to Detective Mary Lett who thereafter made numerous attempts to establish contact with Rebecca, including leaving messages on her telephone answering machine and at the door of her residence, all of which were unsuccessful.

Approximately one month later, on August 9, 2000, Rebecca talked with Lett by telephone and complained that Mills had assaulted her again, contemporaneously with an ominous threat by him that "no one was going to leave alive." Lett and her partner, Detective Susan Fisher, responded to the call by traveling to Rebecca's apartment, but were unable to garner a response. Later during the day, the two officers returned to Rebecca's apartment and found her crying and physically

---

[2] The claims of Christy Caldwell were submitted in her dual capacities as (1) the administrator of her deceased daughter's estate, and (2) Rebecca's mother who seeks to obtain derivative damages for the allegedly tortious conduct by the City.

2

bruised. They escorted her to the warrant clerk's office of the LPD where she would be able to initiate a complaint against Mills. Lett, who described this volatile situation as an "exigent circumstance," hand-carried the warrant to a local prosecutor, submitted it to a judge, and returned the document to the warrant clerk for official processing.[3] Lett also spoke with Rebecca's landlord, to whom she suggested that the locks on her apartment be changed.

While Lett was involved in processing the warrant, her partner attempted to obtain an emergency protective order against Mills. Her effort, however, was thwarted because Rebecca refused to complete the requisite paperwork. As an additional expression of her resistance to any further assistance from the LPD, she scrawled a word of profanity across the uncompleted papers[4] and left the police department.

A few hours later, Mills was arrested. Upon being advised of his arrest, Rebecca pointed out to Lett, with emphasis, "I didn't call you, I don't need you, I don't even know why you're here." J.A. at 231. In fact, Rebecca told Lett that the City's law enforcement officers "were causing the problem, and that she and Mr. Mills wanted to get married." J.A. at 217.

Twelve days later (August 21, 2000), Rebecca remained steadfast in her opposition to the efforts by the LPD to pursue the case against Mills. On the following day, Lett, after personally initiating a criminal complaint against Mills for his criminal conduct on July 4th, was successful in obtaining another arrest warrant against him.[5] However, seven days later, Rebecca filed an

---

[3] The warrant charged Mills with misdemeanor offenses of (1) Terroristic Threatening, Assault in the Fourth Degree, and (2) Unlawful Imprisonment in the Second Degree.

[4] Rebecca "wrote 'f[_ _]k you' across the paperwork of the Emergency Protective Order." Joint Appendix (J.A.) at 107.

[5] Inasmuch as Mills was already in custody, this second arrest warrant was not executed.

3

internal affairs complaint against Lett and Fisher, contending that these two officers had "over executed their authority" when she was (1) transported by them to the City's Fifth District police headquarters against her will, (2) denied an opportunity to call her mother, (3) coerced to sign documents against her will, and (4) forced to swear out a warrant against Mills.

On the following day, Mills' bond was reduced to $1,000 after his father assured "the judge that he would keep [Mills] with him at his home." The court also set aside the outstanding warrant and authorized Mills' release from custody after his father posted the requisite bond.

The Jefferson County Attorney ("County Attorney") filed an appeal to the Jefferson County Circuit Court, protesting Mills' release from custody. In his argument to the State court, the County Attorney maintained that "if . . . [Mills] is allowed to be released on his own recognizance there is a serious safety concern . . . for the victim." J.A. at 29. He also contended that if Mills "is allowed to be released and freely roam and have unlimited access to the victim, the Commonwealth verily believes that [he] will further intimidate and harm the victim." *Id.*

The State court judge agreed and instructed the district court judge to issue a bench warrant for Mills' arrest. Out of his concern for Rebecca's safety, the County Attorney promptly telephoned Lett and advised her that the warrant had been reissued. However, Lett told him in response that she needed to confer with her superiors at the LPD before picking up the warrant in light of Rebecca's pending internal affairs complaint. The arrest warrant remained in the LPD's warrant processing system for six days before it finally reached the Department's field office for implementation.[6]

---

[6] Captain Steve Conrad, who oversees the retrieval and issuance of warrants for the LPD, was questioned during the trial regarding the delay in this case. He said that warrants should have been (1) picked up from the courthouse on a daily basis, (2) sorted into one of the five

4

On September 18, 2000, while the warrant for Mills' arrest was still being processed, the LPD Internal Affairs Department initiated its evaluation of the allegations within Rebecca's complaint. Lett, who was interviewed during this inquiry, declared, "I won't serve [the warrant], I'll have someone else serve it, but I won't go over there to serve it." J.A. at 235. On the same day and prior to the service of the warrant, Mills attacked Rebecca once again and, in so doing, strangled her to death.

## II.

In our assessment of this appeal, we must evaluate the challenged summary judgment decision by the district court on a de novo basis. *See Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 308 F.3d 523, 532 (6th Cir. 2002). In 1986, the Supreme Court opined that "[o]ne of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Nevertheless, such a request for dispositive relief should be granted only if the moving party

---

police districts within the City, and (3) delivered to each district by a courier. Notwithstanding, Conrad acknowledged that (1) he was uncertain about the frequency with which the courier made pick-ups and deliveries to the various districts, (2) there was no record of when warrants were received by his Department, (3) the LPD did not have any method of tracking the location or status of warrants in their system, and (4) there was no policy dictating a time period for how long it should take to process a warrant. Finally, Conrad, referring to the arrest warrant against Mills, said that it should have "come in with all the rest of the warrants, and it would have been processed like all the rest of the warrants." J.A. at 197.

Colonel Greg Smith, the Chief of the LPD, was also questioned during the trial regarding the delay in the issuance of the warrant. He acknowledged that a six-day delay in the issuance of a warrant was unacceptable, the LPD did not keep a log of when warrants were submitted to or released from the Department's headquarters, and there was no policy that detailed the promptness or priority with which arrest warrants were to be processed by headquarters. Significantly, these problems persisted despite Smith's admission that in June 1999, fifteen months prior to Rebecca's murder, a committee had been established to "review . . . the warrant process and outstanding warrants." J.A. at 265.

"show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, it is incumbent that we examine all pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party in the district court. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

### III.

In her appearance in the district court, Christy Caldwell contended that the City had a duty to protect Rebecca who, in her judgment, had been made more vulnerable to danger through its inadequate warrant processing system and subsequent pursuit of a case against Mills. In response, the City denied this allegation, submitting that no casual connection ever existed between its challenged conduct and Mills' private acts of violence. In its ruling, the district court determined that it was not enough for Christy Caldwell to allege a "state-created danger," but declared that she must also demonstrate that the claimed municipal misconduct "shocks the conscience." The district court, while declining to rule on whether the facts could sufficiently support Christy Caldwell's assertions of a "state-created danger," granted a summary judgment against her because it concluded "that no reasonable finder of fact could find that the City's culpability rose to the level of 'conscience shocking.'"

### A.

Christy Caldwell asserted her claim against the City under 42 U.S.C. § 1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

6

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

In evaluating a claim against a municipality under this statute, this court must seek to determine "(1) whether [the aggrieved party's] harm was caused by a constitutional violation, and (2) if so, whether the [City] is responsible for that violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).

In so doing, we will initially address the issue involving municipal "culpability," and then consider whether Christy Caldwell adequately alleged that the City "caused" a constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385-86 (1989) ("our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"); *see also Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) ("a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights").

B.

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978), the Supreme Court held that "Congress . . . intend[ed] municipalities and other local government units to be included among those persons to whom § 1983 applies." The *Monell* Court also "conclude[d] that a municipality cannot be held liable solely because it employs a tortfeasor--or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."

7

*Monell*, 436 U.S. at 659. On the other hand, a municipality may be held liable if the "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.*

In addition to identifying some form of "conduct [that is] properly attributable to the municipality," a plaintiff must establish that the challenged municipal action carries a sufficient degree of culpability. *Brown*, 520 U.S. at 404. If the claim alleges that the municipal action violates a federal law (e.g., a facially unconstitutional policy), then the culpability issue is readily apparent. On the other hand, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id*. at 407. The phrase, "deliberate indifference," requires the production of evidence "that a municipal actor disregarded a known or obvious consequence of his action." *Id*. at 410.

Applying these principles to the present case, we find that the deficiencies in the LPD's warrant processing policies were well known by police officials during the August and September months of 2000, but were never corrected. There is also evidence that the LPD knew or should have known that their practices could render citizens more vulnerable to danger.[7]

_____

[7] In support of her case before the district court, Christy Caldwell obtained the opinion of an expert witness, Joseph J. Stine, who had 10 years of experience as the former Police Chief of New Britain Township, Pennsylvania, and 25 years of experience in every rank from patrolman through inspector with the Philadelphia Police Department. In his opinion,

> The LPD in the person of Detective Lett was aware of the danger [that Mills] posed to [Rebecca]. . . . Detective Lett had correctly identified that . . . Mills was a threat by September 12, 2000. In fact as an experienced Domestic Violence officer Detective Lett must have been aware that *the danger to [Rebecca] had actually increased*. Perpetrators of domestic violence are known to be

8

Under the circumstances of this case and viewing the evidence in a light that is most favorable to Christy Caldwell, the LPD, at a minimum, failed to implement a reasonable policy for processing warrants despite its recognition for such a need and in spite of the obvious risks that its actions would violate a constitutional right.

C.

Having found the existence of municipal culpability from the City's failure to correct its deficient warrant processing and execution polices, we now turn to an examination as to whether the City caused a constitutional violation. Here, Christy Caldwell complains that, as a result of the LPD's failed policies, her daughter's fundamental right to substantive due process were trammeled. The Supreme Court has called upon the lower courts to give careful scrutiny of all substantive due process claims that are brought under § 1983 "because guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125 (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-26 (1985)). In addition, the Supreme Court has declared that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195 (1989). The Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels

---

more likely to increase the frequency and severity of their abuse in the period immediately after the victim seeks assistance from the Criminal Justice System.

J.A. at 67 (emphasis added). In an affidavit, he specifically opined that Rebecca was "at a substantially increased risk of harm from Benjamin Mills upon his release from custody on August 30, 2000. It is well-known that abusers are more dangerous upon being release from custody, as they usually try to reassert their power and control over the victim." J.A. at 165.

of safety and security." *Id.* "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196. Consequently, the Due Process Clause does not confer an affirmative right to governmental aid.

As a general rule, the State does not have an affirmative duty to protect its citizens from private acts of violence. On the other hand, the Supreme Court in *DeShaney* explicitly recognized one exception to this rule and alluded to another. The first exception can occur "when the State takes a person into its custody and holds him there against his will." *Id.* at 199-200. In such a situation, the Constitution imposes "a corresponding duty [upon the State] to assume some responsibility for his safety and general well-being." *Id.* at 200. The affirmative duty to protect a citizen in custody "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200. In those situations in which the State has acted affirmatively to restrain the individual's freedom and deprive him of liberty, this affirmative action triggers the protections of the Due Process Clause. *See id.*

The second exception has been recognized in every court of appeals, including this Circuit, and has evolved from the language in *DeShaney*, wherein the Supreme Court stated that while "the State may have been aware of the dangers that [the victim] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. This passage has become known as the "State-created danger" exception. "Even in noncustodial settings, . . ., State officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way." *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002). Under the State-created danger

10

exception, "many State activities have the potential to increase an individual's risk of harm." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir.1998). So, in *Kallstrom*, this Court held that "we require plaintiffs alleging a constitutional tort under § 1983 to show 'special danger' in the absence of a special relationship between the State and either the victim or the private tortfeasor." *Id.* We further explained that an aggrieved party faces a "special danger" when "the State's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large." *Id.*

The situation in which Rebecca was involved does not satisfy the custodial or "special relationship" exception. It is uncontested that she was not in the custody of the State at the time of her death. Although her mother argues that it is enough for the victim or the private tortfeasor to have this "special relationship," it is also quite evident that Mills was not in State custody when he strangled Rebecca.

In her briefing papers, Christy Caldwell urges the Court to find the existence of a "special relationship" because, in her opinion, the LPD (1) knew of Mills' criminal history, as well as the potential for violence that he presented to her daughter, (2) had taken him into custody prior to the date of the murder, and (3) failed or refused to serve the warrant on him in violation of Kentucky law. With regard to her first two arguments, neither the LPD's knowledge of Mills' past antisocial conduct nor its prior custody of him creates a "special relationship" as that term was used by the Supreme Court. Christy Caldwell has not cited any authority to support her position on this issue.

Moreover, as it concerns her third point, we have rejected the notion that the mere violation of a state law may give way to a constitutional violation under the Due Process Clause. In *Jones v. Union County, Tenn.*, 296 F.3d 417, 430 (6th Cir. 2002), we held that "whatever duty Union

11

County owed to Plaintiff as a matter of Tennessee tort law does not give rise to a constitutional duty." *See also DeShaney*, 489 U.S. at 202 ("A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not all common-law duties owed by government actors were constitutionalized by the Fourteenth Amendment.") (internal quotation omitted). As a result, it was our conclusion that the aggrieved party did not demonstrate a "special relationship" because this "exception in the due process context has been limited to situations in which the State affirmatively acts to restrain an individual to act for himself or herself." *Jones*, 296 F.3d at 430. Applying these principles to the present case clearly reveals that the adoption of a "special relationship" or custodial exception would not be appropriate here.

On the other hand, we reach a different conclusion with regard to the applicability of the "State-created danger" exception. Under this exception, it is enough if "the City's actions . . . substantially increas[ed] the likelihood that a private actor would deprive [Rebecca] of [her] liberty interest in personal security." *Kallstrom*, 136 F.3d at 1067. In addressing this issue, Christy Caldwell contends that the LPD took some affirmative steps which increased the risk of harm to her daughter. She also maintains that Rebecca was forced by the LPD detectives to accompany them downtown against her will and to process paperwork in support of the first warrant, which eventually led to Mills' arrest. As evidence of her unwillingness to seek Mills' criminal prosecution, Christy Caldwell focuses upon Rebecca's refusal to cooperate with law enforcement authorities and her subsequent complaint against Lett and Fisher. Thus, viewing the evidence in a light most favorable to Christy Caldwell and accepting the validity of the opinion of her expert

12

witnesses, we conclude that the LPD undertook some affirmative conduct which ultimately increased Rebecca's risks of harm.

## D.

Although she has established a causal connection between the State action and the criminal conduct of Rebecca's abusive boyfriend in order to assert a violation of substantive due process, Christy Caldwell, as the aggrieved party in this litigation, must still show that the State acted with the requisite culpability. It is "not enough to show a causal connection between State action and an act of private violence. . . . [She] must demonstrate that the State acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." The Supreme Court has explained that "the touchstone of due process is protection of the individual against arbitrary action of government," *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)), and "that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Lewis*, 523 U.S. at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115,129 (1992)). Finally, the Court said that "for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis*, 523 U.S. at 846.

In determining whether State action "shocks the conscience," this Court has recognized that this standard is "no calibrated yard stick.'" *Ewolski*, 287 F.3d at 510 (quoting *Lewis*, 523 U.S. at 847). Thus, in our review, we note that at one end of the spectrum, "the standard requires a showing beyond mere negligence." *Ewolski*, 287 F.3d at 510. Mere negligence cannot be said to shock the conscience. "At the other end of the spectrum, it is generally agreed that Fourteenth Amendment liability will attach to conduct intended to injure in some way unjustifiable by any

13

governmental interest." *Id*. However, it is obvious that the culpability which is attendant to an official's conduct will often lie somewhere between mere negligence and actual intent. "Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Lewis*, 523 U.S. at 849. Two years ago, we wrote:

> Whether conduct falling within this 'middle range' reaches the level of conscience shocking depends upon the facts and circumstances of the individual case. As the Supreme Court recently explained, conduct that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

*Ewolski*, 287 F.3d at 510. An evaluation of a challenged conduct in this "middle range" has typically turned on whether, in the individual case, it can be said that the State officials were deliberately indifferent. Notably, the *Lewis* Court declared that "the deliberate indifference standard is sensibly employed only when actual deliberation is practical." *Lewis*, 523 U.S. at 851.

Thus, in assessing whether the State officials were deliberately indifferent, "the critical question . . . is whether the circumstances allowed the State actors time to fully consider the potential consequences of their conduct." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 373 (9th Cir. 1998). For example, deliberate indifference on the part of prison officials can subject them to due process liability because they presumptively enjoy the luxury of "having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Lewis*, 523 U.S. at 853. However, in the context of a high speed vehicle chase, "a Fourteenth Amendment violation occurs only when the police act with malice and an 'intent to harm.'" *Ewolski*, 287 F.3d at 511 (quoting *Lewis*, 523 U.S. at 854). This

14

is so because "when unforseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the large concerns of the governors and the governed." *Ewolski*, 287 F.3d at 511 (internal quotation omitted).

Drawing upon the decision by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), this Circuit has said that

> Deliberate indifference has been equated with subjective recklessness, and requires the § 1983 plaintiff to show that the State official knows of and disregards an excessive risk to [the victim's] health or safety. Thus, *the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference*. Having drawn the inference, the official must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights.

*Ewolski*, 287 F.3d at 513 (emphasis added). Similarly, in *Upsher v. Grosse Pointe Public School System*, 285 F.3d 448, 453 (6th Cir. 2002), this Court held that "in order to succeed on a § 1983 claim in a non-custodial setting, a plaintiff must prove either intentional injury or 'arbitrary conduct intentionally designed to punish someone--e.g., giving a worker a particularly dangerous assignment in retaliation for a political speech . . . or because of his or her gender.'" (quoting *Lewellen v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 34 F.3d 345, 351 (6th Cir. 1994).

Under the circumstances which have been placed upon the record, it is our judgment that Christy Caldwell can succeed in establishing that Lett was deliberately indifferent to the risks and dangers that her daughter faced during the mid-months of 2002. The record establishes that the County Attorney called Lett immediately after the State court reissued a warrant for Mills' arrest on September 13th. Her refusal to act upon the warrant and the City's existing internal law

15

enforcement practices and policies resulted in a six day delay in its execution. In refusing to act upon the arrest warrant, Lett demonstrated neither mere negligence nor an actual intent to bring about a specific harm upon Rebecca. Thus, her culpability would appear to fall within the "middle range," and require this Court to determine if she was deliberately indifferent under the circumstances. Clearly, Lett had several days in which to fully consider and reflect upon her decision not to serve the warrant on Mills. The evidence also indicates that she was aware of facts from which a reasonable inference could be drawn that Rebecca faced a substantial risk of serious harm. The evidence also suggests that Lett's failure or refusal to process the warrant in a timely manner stemmed from an animus toward Rebecca who had (1) refused to provide the LPD authorities with any semblance of cooperation in dealing with a potentially dangerous situation, and (2) filed allegations of police misconduct against her. In the face of a real danger about which Lett knew or should have known, her adamant refusal to serve the warrant or have it served upon Mills by another law enforcement official clearly equates to the kind of deliberate indifference which is forbidden by the Constitution.

Having found the existence of a "State-created danger" and of deliberate indifference by a State actor, we conclude that Christy Caldwell has asserted a viable claim for a violation of her daughter's constitutional right to substantive due process.

IV.

Turning to Christy Caldwell's claim of negligence under Kentucky law, the district court correctly awarded a summary judgment in favor of the City. In *City of Florence, Kentucky, et al. v. Chipman*, 38 S.W.3d 387, 392 (2001), the Kentucky Supreme Court rejected a wrongful death negligence claim:

16

In order for a claim to be actionable in negligence, there must be the existence of a duty and unless a special relationship was present, there is no duty owing from any of the police officers to Black to protect her from crime or accident. In order for the special relationship to exist, two conditions are required: (1) the victim must have been *in State custody or otherwise restrained by the State at the time the injury producing act occurred*, and (2) the violence or other offensive conduct must have been committed by a State actor.

*Id*. at 392 (emphasis added). Thus, in order to establish such a duty, Kentucky law requires an aggrieved party to demonstrate the existence of a special relationship. To satisfy this requirement, Christy Caldwell is obliged to demonstrate that (1) Rebecca was in State custody or otherwise restrained by the State at the time of her death, and (2) her death was caused by a State actor. Even when examining the pleadings in a light that is most favorable to Christy Caldwell, there is no allegation or evidence that Rebecca was ever in State custody or that her untimely demise was committed by a State actor. As such, she cannot establish a wrongful death negligence claim against the LPD pursuant to Kentucky law. Accordingly, the City was entitled to a summary judgment on this claim.

V.

For the reasons that have been articulated above, we AFFIRM, in part, and REVERSE, in part, the decision of the district court, and REMAND this cause of action for proceedings that are consistent with this opinion.

17