RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0161p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 06-3954

JAMES BUCKMASTER,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-00038—James Gwin, District Judge.

Argued: April 20, 2007

Decided and Filed: May 7, 2007

Before: MERRITT and MARTIN, Circuit Judges; FORESTER, District Judge.[*]

---

## COUNSEL

**ARGUED:** Albert L. Purola, Willoughby, Ohio, for Appellant. Robert F. Corts, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Albert L. Purola, Willoughby, Ohio, for Appellant. Robert F. Corts, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. James Buckmaster pled guilty to unlawful possession of explosives—here, commercial fireworks—in violation of 18 U.S.C. § 842(a)(3)(A), after unsuccessfully moving to suppress the explosives on grounds that they were found in his basement pursuant to an illegal search. He now appeals a single issue: the district court's denial of his motion to suppress. For the reasons outlined below, we **AFFIRM**.

I

On May 14, 2005, the Madison Township (Ohio) Fire Department responded to a fire at Buckmaster's home. Heavy black smoke was observed billowing from the second floor window.

---

[*] The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Firefighters safely evacuated all the residents, including Buckmaster, his wife, and the tenants who lived in an attached rental apartment. The firefighters then entered the home and extinguished the fire, which appeared to be confined to the headboard of Buckmaster's waterbed in an upstairs bedroom. The fire was extinguished with water from a pressured firehose. Added to this amount of water, however, was discharge from the waterbed itself, which had been punctured at some point during the course of events. Apparently, a "piece of glass or mirror" from the burning headboard had fallen down and ruptured the waterbed. (It is unclear from the record whether the waterbed was punctured during the course of the fire, or whether it was punctured during the course of the firefighters' efforts to contain it.) The water quickly seeped from the second floor to the first and then to the basement, requiring the firefighters to install tarpaulins throughout the house to minimize drywall and other structural damage to the house, as well as to minimize the possibility of the water seeping into the walls and creating an electrical short.

Also present on the scene was Sergeant Matthew Byers, a member of the Madison Township Police Department and a certified firefighter and investigator. Byers recalled that his department had recently received several complaints regarding Buckmaster setting off fireworks on his property. He relayed this information to the fire chief. Concerned that there might be live fireworks in the still-burning home, the fire chief questioned Buckmaster, who was at this point outside. Buckmaster freely admitted that there were fireworks inside, but also indicated that they were not in close proximity to the fire.

Byers then entered the house and went upstairs to the bedroom, hoping to begin his investigation into the cause and origin of the fire. He was accompanied by another fire investigator, Officer Tom Perko. Perko was a member of the fire department, not the police department, and was a more experienced fire investigator than Byers. The two could not start their investigation, however, until the water was cleared from the bed and bedroom, and thus they decided instead to check the residence for high carbon monoxide levels and for "other possible dangers to the structure from the fire." Tr. at 23 (Byers Test.); *see also id.* ("[I]t's kind of standard practice to check the rest of the residence for pockets of carbon monoxide or for carbon monoxides [sic] that's been moved through the residence by the heating and cooling [systems]. . . ."). Byers and Perko used a hand-held meter to check and clear the second floor for carbon monoxide, did the same on the first floor, and then began checking the basement. They noticed substantial amounts of water draining through to the basement, and told firefighters to bring more tarps down. They also decided to check the furnace room in the basement, both for carbon monoxide levels and for electrical and structural dangers owing to the leaking water.

Upon entering the furnace room, Byers and Perko noticed in plain view, approximately ten feet from the furnace, several boxes marked as containing 1.4G and 1.3G explosives. Some of the boxes had already been opened, and Byers and Perko could plainly see the fireworks inside. The total amount of explosives was approximately 1,250 pounds. The fireworks were seized, and Buckmaster was ultimately charged under 18 U.S.C. § 842(a)(3)(A).[1]

Buckmaster filed a motion to suppress the fireworks. The motion was denied by the district court in an order dated April 3, 2006. Buckmaster subsequently entered a conditional guilty plea,

---

[1] 1.3G explosives are a kind of commercial-grade firework. Under § 842(a)(3)(A), a person may not, *without a license*, "transport, ship, cause to be transported, or receive" such explosive materials. *See also* 18 U.S.C. § 844(j) (defining the term "explosive"); 18 U.S.C. § 841(c) (defining the term "explosive materials"); U.S.S.G. § 2K1.3 (outlining base offense levels and enhancements based on the quantity of explosives possessed). 1.4G explosives require no such license, but must nevertheless be properly stored. *See* U.S.S.G. § 2K1.1. A more thorough discussion of the distinction between 1.3G and 1.4G fireworks, as well as the statutory framework into which they fit, is provided in a recent opinion from one of our sister circuits. *See United States v. Shearer*, 479 F.3d 478 (7th Cir. 2007). Buckmaster does not contest the government's application of § 842(a)(3)(A) or any related statutory provisions to his case. He merely appeals the search of his house as improper on Fourth Amendment grounds.

reserving the right to appeal the denial of his motion to suppress. On June 27, the district court sentenced Buckmaster to 12 months in custody. The execution of his sentence has been stayed pending the outcome of his appeal.

II

When reviewing a denial of a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Jones*, 159 F.3d 969, 973 (6th Cir. 1998). This Court must review the evidence "in a light most likely to support the district court's decision." *Id.*

Buckmaster claims that Sergeant Byers and Officer Perko violated his Fourth Amendment rights when they opened the door to, and subsequently entered, his basement furnace room.[2] Buckmaster relies almost exclusively on two Supreme Court cases, *Michigan v. Tyler*, 436 U.S. 499 (1978), and *Michigan v. Clifford*, 464 U.S. 287 (1984). In *Tyler*, a case involving the suspected arson of a furniture store, the Court laid out an important principle involving searches by firefighters or police during and immediately after a fire:

> an entry to fight a fire requires no warrant, and . . . once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches.

436 U.S. at 511. In other words, "[t]he firetruck need not stop at the courthouse in rushing to the flames. But once the fire has been extinguished and the firemen have left the premises, the emergency is over." *Id.* at 516 (White, J., concurring in part and dissenting in part). In *Clifford*, another case in which arson was suspected, the Court attempted to clarify its *Tyler* holding for situations where a private residence, and not a commercial building, was the subject of the fire and subsequent search. Justice Stevens, writing in concurrence, explained as follows:

> There is unanimity within the Court on three general propositions regarding the scope of Fourth Amendment protection afforded to the owner of a fire-damaged building. No one questions the right of the firefighters to make a forceful, unannounced, nonconsensual, warrantless entry into a burning building. The reasonableness of such an entry is too plain to require explanation. Nor is there any disagreement concerning the firemen's right to remain on the premises, not only until the fire has been extinguished and they are satisfied that there is no danger of rekindling, but also while they continue to investigate the cause of the fire. We are also unanimous in our opinion that after investigators have determined the cause of the fire and located the place it originated, a search of other portions of the premises may be conducted only pursuant to a warrant, issued upon probable cause that a crime has been committed, and specifically describing the places to be searched and the items to be seized.

464 U.S. at 299-300.

Buckmaster argues that because Madison police and fire officials were not "searching for the cause and origin of the fire when they began to check for carbon monoxide," and because they had not obtained a search warrant, therefore "the search of the remaining portions of the house, not for fire causation evidence, but for carbon monoxide levels, was per se unreasonable." Appellant's

---

[2] Buckmaster does not contest Byers's and Perko's assertion that once they entered the room, the fireworks were in plain view.

Br. at 12-13. This argument not only improperly narrows the government's justifications for its search, it also fails because it restricts *Tyler* and *Clifford* to the notion that fire officials may remain in a building for a reasonable time after the blaze has been put out, but *only* to investigate the cause of the blaze.

*Tyler* and *Clifford* focused on the reasonable period firefighters may remain in a burned-out residence to investigate the cause and origin of the fire for a very simple reason: they were both cases in which fire investigators had a strong suspicion of arson. The two cases say little, however, about the often more common, and more obvious, reason that fire officials may remain in a fire-damaged residence: namely, to make sure that the residence is safe for its inhabitants to return to. This may require that the fire officials inspect portions of the house for the possibility that the fire might rekindle; it may require that they inspect portions of the house for electrical or structural damage; or it may require that they make sure the house is free of high carbon monoxide levels. Indeed, Justice Powell endorsed searches in these types of exigent circumstances when he noted that

> [t]he aftermath of a fire often presents exigencies that will not tolerate the delay necessary to obtain a warrant or to secure the owner's consent to inspect fire-damaged premises. . . . [T]he warrant requirement does not apply in such cases. For example, an immediate threat that the blaze might rekindle presents an exigency that would justify a warrantless and nonconsensual post-fire investigation.

*Clifford*, 464 U.S. at 293 & n.4.

Justice Powell alluded only to *hypothetical* exigencies—note his use of the clause, "For example"—in the aftermath of a fire, because in *Clifford* the state had not argued that such exigencies existed. Instead, the state was asking the Supreme Court to carve out a broad exception to the Fourth Amendment warrant requirement in suspected-arson cases, an invitation the Court rightly declined to accept. *See id.* at 296 ("[T]he State does not claim that exigent circumstances justified its post-fire searches. It argues that we either should exempt post-fire searches from the warrant requirement or modify *Tyler* to justify the warrantless searches in this case."). *Clifford* appears, therefore, to require a specific, articulable exigency to exempt post-fire searches from the warrant requirement. In the instant case, Madison Township points to not one, but two such specific exigencies.

### A.  Electrical Dangers

The first exigency arose from the fact that water from the firehoses and the waterbed was coursing down the interior walls of Buckmaster's house.[3] Although the fire in the bedroom had been put out, the water seeping throughout the house created a continued danger of electrical shorts. Fire officials noticed water streaming down the walls from the bedroom to the first floor, and from the first floor to the basement. As Officer Perko testified at the suppression hearing: "As soon as we got to the basement we saw large amounts of water, basically raining in the basement and coming out of outlets and such things. We knew we had to, you know, turn off the utilities, make sure that we get, you know, tarps and stuff in the basement." Tr. at 73.

---

[3]It does not matter if in fact the firefighters, in putting out the fire, actually *caused* the mirror to fall on the bed and puncture it, releasing even more water into the house. While the firefighters may have thus *created* the exigency, nothing in the record indicates that they did so intentionally, recklessly, or even negligently. *See, e.g., Ewolski v. City of Brunswick*, 287 F.3d 492, 504 (6th Cir. 2002) (noting that "created-exigency cases" typically require at least *some* showing of "deliberate conduct on the part of the police evincing an effort intentionally to evade the warrant requirement").

No such exigency was present, or was asserted to be present, in either *Tyler* or *Clifford*. The only issue in both cases was whether it was "reasonable" for arson investigators to have delayed their investigation (and attendant search) of the cause and origin of the fire for several hours, even though the fire had already been fully extinguished. In *Tyler*, the delay between the time firefighters left the scene of the extinguished fire and then returned to re-investigate was approximately four hours, yet the Supreme Court deemed this reasonable because any cause-and-origin investigation during this gap would have been futile due to lingering "darkness, steam, and smoke." 436 U.S. at 511. In *Clifford*, the delay was approximately five hours, which the Supreme Court deemed unreasonable because Michigan had not offered any evidence, as in *Tyler*, that it could not have conducted its cause-and-origin investigation more promptly. *Clifford*, 464 U.S. at 296. Furthermore, in the five-hour intervening period the *Clifford* homeowners had already taken affirmative steps to "secure the privacy interests that remained in their residence against further intrusion," such as by ordering a work crew to board up the house. *Id.*

Here, however, the firefighters did not leave and then later return, as in *Tyler* or *Clifford*. Their initial efforts were directed at extinguishing the fire in the bedroom; then their efforts turned toward ensuring that the house did not sustain electrical or structural damage owing to the water that had been released in the bedroom, and toward ensuring that carbon monoxide levels were at an acceptable level. All this appears to have lasted less than one hour. Tr. at 35 (Perko Test.); Tr. at 60 (Byers Test.). Nothing in the express language of *Tyler* and *Clifford*, nor in what can be inferred therefrom, suggests that it is unreasonable for firefighters to act in this fashion, even if it involves making warrantless entries into some of the rooms of the house not directly affected by smoke or fire. If the government provided unrefuted testimony that water was "basically raining in the basement and coming out of outlets and such things," we fail to see how Buckmaster can claim that it was unreasonable for Madison Township firefighters to stem this flow of water and prevent it from causing electrical shorts or other potential electrical dangers.

It seems an unremarkable proposition that if firefighters are aware of lurking electrical dangers resulting from their efforts to put out a fire in a home—imagine, for example, a homeowner who returns to his salvaged house and attempts to plug an appliance into a moist socket, especially an old socket not fitted with a ground fault circuit interrupter—they should neither have to obtain a warrant nor the express permission of the homeowner in order to alleviate such dangers, especially when they do so, as here, *immediately* after the fire has been extinguished. This temporal caveat is important, for it makes all the difference in assessing reasonableness. In *Clifford*, for example, when the arson investigators returned to the house some five hours after the blaze had been extinguished, they were met by a work crew that was not only boarding up the house but was also "pumping some six inches of water out of the basement." 464 U.S. at 290. Had the fire officials in *Clifford* attempted to justify their reentry at this point on grounds that they wished to ensure the electrical safety of the house (an argument which they wisely did not make), such justification would have been utterly *un*reasonable and pretextual, because they could of course have taken such action five hours earlier.[4]

---

[4]Buckmaster argues that the search of his basement was likewise pretextual, because he had already admitted to Madison Township fire officials that fireworks were present somewhere in his house. While we cannot entirely rule out this possibility, we note that in this case the fire officials had entirely reasonable and entirely believable grounds for conducting their search. As such, we cannot agree that they were motivated by pretext, i.e., that their sole purpose in searching the house was to locate the fireworks. Mere possession of fireworks, after all, is not per se illegal. To say that the fire officials in this case could have divined from his admission that Buckmaster possessed such a large quantity of 1.3G fireworks (thus subjecting him to federal criminal prosecution) stretches the imagination a bit too far.

### B.  Carbon Monoxide Exigency

The government justifies its search on a second exigency, but this one we are less inclined to endorse on the instant facts.  The government claims that the upstairs fire had released a considerable amount of smoke into the home, and that the central heating/cooling system had the potential to recirculate this air, thus creating a danger that carbon monoxide levels might be raised not just in the upstairs bedroom, but throughout the house.  As Officer Perko testified, "if the heating and cooling equipment is operating, it will move CO [carbon monoxide] throughout the house."  Tr. at 75.

The threat of high carbon monoxide levels was not specifically identified in *Clifford* as an exigency "that will not tolerate the delay necessary to obtain a warrant."  464 U.S. at 293 & n.4.  Yet it seems almost beyond argument that before they allow residents to reenter a fire-damaged structure, firefighters should be allowed to check, immediately and without first obtaining a warrant, carbon monoxide levels in affected areas.  After all, the firefighters would likely be deemed negligent if they were *not* to check: that is, if they were to allow residents to return to a home still chock full of carbon monoxide. In this case, however, Buckmaster points out that "[w]hether CO may have been present was no longer a risk factor because oxygen masks had long since been removed by all and the focus was entirely on property damage."  Appellant's Br. at 15.  He further argues that "[t]he acceptance of such a theory would constitutionalize a dubious policy and gut the Fourth Amendment protection *Clifford* confers."  *Id*.

On the one hand, Buckmaster's fears are somewhat overblown because a sweep for carbon monoxide levels is likely to be *less intrusive* than a search for the cause-and-origin of a fire.  A cause-and-origin search, conducted within a reasonable timeframe after the a fire has been extinguished (pursuant to the mandate of *Tyler* and *Clifford*), requires that investigators substantially disrupt the "effects" of a private individual's home.  Drawers and cabinets may be opened, samples of carpet or upholstery may be seized, and so on — all for the purpose of determining if a particular fire was deliberately set and if so, how it was set and by whom.  A search for carbon monoxide levels, which involves no more than entering a room for a few moments and checking the readings on an electronic monitor in several places throughout the room, does not rise to the same level of intrusiveness in any particular room.  On the other hand, Buckmaster is correct that firefighters working on the first and second floors had removed their breathing devices prior to the Byers/Perko sweep — in other words, it was obvious to most of those present that carbon monoxide levels were in the acceptable range.  This stands to reason given that the bed frame fire was quite small and contained, and that the firefighters had already opened windows and placed industrial-strength fans in the upstairs rooms to clear the smoke well before Byers and Perko arrived on the scene.

In light of these facts, it seems highly unlikely that carbon monoxide would have moved from the second floor to the basement in the absence of forced-air circulation generated by the furnace.  Furthermore, Investigator Perko testified on cross-examination that he was unsure if the furnace was even turned on.  He did not specifically concede that this was unlikely, but he did admit that the date of the fire was May 14 — i.e., hardly the dead of winter.  Absent stronger evidence in the record—such as, say, expert testimony as to how easily carbon monoxide can move from room to room or floor to floor, in the absence (or presence) of a forced-air heating or cooling system—we decline to endorse a broad reading of the carbon-monoxide exigency in fire cases generally, especially where, as discussed in Part II-A, the government has a stronger card to play.

### III

Oxymoronic and unfortunate as it may seem, Buckmaster appears to have been done in by a burning waterbed.  The fire on the waterbed led to the bed being punctured, which in turn led to potential electrical dangers throughout much of the house due to the seepage of excess water into

the rooms below. This exigency justified local fire officials' warrantless search of many of the rooms of the house—including the furnace room in which the explosives were found in plain view—to ensure that the water was cleaned up and no such damage had occurred. We therefore **AFFIRM** the district court's denial of Buckmaster's motion to suppress the explosives.